## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION UNDER § 1983 |
| | ) | |
| vs. | ) | Case No. 1:15-CV-01691 |
| | ) | |
| MARY DIANE SCHWARZ, P.A. | ) | Hon. Sheila Finnegan |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

### PLAINTIFF WILLIAM WILLIAMS'S SECOND AMENDED COMPLAINT

NOW COMES Plaintiff, William Williams ("Williams"), by and through his Court-appointed counsel, and for his Second Amended Complaint against Defendant Mary Diane Schwarz, P.A. ("Schwarz") states as follows:

### INTRODUCTION

1.      This civil action seeks damages against Schwarz for, *inter alia*, committing acts under color of state law that deprived Williams of rights secured by the United States Constitution and the laws of the United States. Specifically, Schwarz repeatedly acted with deliberate indifference to Williams's serious medical need, depriving Williams of his rights guaranteed by the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

2.      This action also asserts an Illinois common law medical malpractice claim against Schwarz and seeks damages against her for negligence in the provision of Williams's medical care. Schwarz repeatedly failed to conform to applicable standards of medical care, causing Williams significant and unnecessary pain, suffering, and lasting complications.

## JURISDICTION AND VENUE

3.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Williams's rights as secured by the United States Constitution.

4.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

5.      This action also asserts an Illinois common law medical malpractice claim.

6.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Williams's claims occurred in the Northern District of Illinois.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      Upon information and belief, Williams has fulfilled the requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), requiring inmates to exhaust all available remedies prior to filing suit under 42 U.S.C. § 1983 alleging violations of his constitutional right to adequate medical care.

## PARTIES

9.      From on or about March 4, 2013, to on or about November 25, 2013, Williams was a pre-trial detainee in custody at Stateville Northern Reception and Classification Center ("Stateville NRC"), a facility operated by the Illinois Department of Corrections ("IDOC"). During that time, he required but did not receive treatment for his Type 2 Diabetes Mellitus ("Diabetes").

10.      Schwarz is a Physician Assistant licensed to practice in Illinois. At all relevant times, Wexford Health Sources, Inc. or IDOC employed Schwarz to provide medical care at Stateville NRC. As such, Schwarz treated Williams directly and made decisions about his medical care. Schwarz acted under color of state law in performing these duties.

2

## FACTUAL ALLEGATIONS

### Williams's Diabetic History

11.     Williams was diagnosed at age 43 with Diabetes in September 1993.

12.     Williams has been consistently treated for Diabetes throughout several incarcerations in IDOC facilities since at least 1997. After starting on Glucotrol, Williams transitioned in 1994 to Insulin therapy. He received Insulin over the course of multiple incarcerations, including while at Stateville NRC in 2005 and 2009.

13.     Immediately before Williams's detention at Stateville NRC on March 4, 2013, he took Insulin 70/30 twice daily, seven units in the morning and 15 units in the evening. He also managed his Diabetes with 500 milligrams of Metformin twice daily.

14.     Prior to his arrival at Stateville NRC in 2013, Williams had eye exams in May 2008, November 2009, and May 2011. None of these exams revealed diabetic retinopathy.

### Schwarz Fails to Treat Williams's Diabetes

15.     During Williams's Stateville NRC intake assessment on March 4, 2013, a Resident Nurse named C. Smith noted his history of Diabetes for which he took Insulin and Metformin. Smith recorded Williams's weight at 152 lbs., his blood pressure at 139/83, and his blood sugar level at 223mg/dL (elevated above the target range determined by the American Diabetes Association of 80-130 mg/dL before a meal and less than 180 mg/dL one-to-two hours after the beginning of the meal (the "Target Range")). Smith also documented Williams's history of depression and his previous suicide attempt in 1980. She recommended an urgent mental health referral.

16.     Some 90 minutes after Smith examined Williams, Schwarz saw him. She performed a perfunctory exam with no mention of Williams's elevated blood pressure, his

3

history of depression, or his suicide attempt. A repeat blood sugar reading showed Williams's blood sugar level was 180. Williams told Schwarz that he took Insulin and Metformin to manage his Diabetes. Schwarz noted that Williams has been a diabetic for 20 years and that he wanted Insulin. Nonetheless, Schwarz wrote "WANTS INSULIN?" in Williams's chart and concluded "[n]o Insulin." She then stopped all six medications on Williams's intake sheet, including his chronic Metformin and others that treated his diabetes and its symptoms such as chronic neuropathy. Schwarz ordered Williams's blood sugar levels checked twice daily from March 5 to April 5, 2013.

17.     Unfortunately, rather than being checked as ordered, Williams's blood sugar levels were only checked twice daily from March 5 to March 14, 2013. During those ten days, Williams's blood sugar levels fluctuated between 87 and 193. Out of 17 recorded readings, seven were outside of the Target Range. When Williams's lab results came back abnormal, Schwarz signed them but took no further action.

18.     Schwarz examined Williams again on March 8, 2013. During that examination, Williams's registered a blood sugar reading of 158mg/dL. Again Williams told Schwarz that he needed Insulin and took Metformin twice daily to manage his Diabetes. Williams also reminded Schwarz that she had personally provided him with Insulin and Metformin to manage his Diabetes on a previous occasion. Nonetheless, Schwarz wrote "on no medication here" and refused to prescribe Williams Insulin, Metformin, or any other Diabetes medication.

19.     After his blood sugar check on March 14, 2013, Williams had no further contact with the health care unit until May 9, 2013. During that eight-week gap, Williams sent numerous sick call request slips to the health care unit. He also tried to discuss the lack of medical care for his Diabetes with various NRC staff members. Williams filed grievances in

4

April and May 2013, related to the complete lack of medical care that he received for his Diabetes. When Williams began to experience vision problems in his right eye in April, he reporter the problem but could not get a referral to an eye specialist.

20.     On May 9, 2013, Schwarz examined Williams after security brought him to her curled over in a wheelchair due to back pain. As far as Schwarz was concerned, it was "unclear why" Williams arrived. During his examination, Williams again told Schwarz that he needed but had not yet received Insulin or Metformin to manage his Diabetes. Schwarz wrote in her examination notes from that day: "I didn't believe he was on Insulin. I told him no Insulin until I got his records. His records confirm he was never on Insulin." Yet again, Schwarz refused to prescribe Williams Insulin, Metformin, or any other Diabetes medication. No medical professional examined Williams again until July 24.

### Schwarz Inadequately Treats Williams's Diabetes

21.     Schwarz examined Williams on July 24, 2013, after he filed another grievance. Despite Williams's history of begging for his diabetes medication, Schwarz wrote "no complaints to anyone." During the examination, Williams underwent three glucometer tests that all registered his blood sugar levels above 300mg/bL with the highest being 426mg/bL (way above the Target Range). Lab results returned on July 25 and signed by Schwarz revealed alarmingly high blood sugar levels that demonstrated Williams suffered from severe glucose toxicity. Schwarz started Williams on far too low a dose of Insulin and a topical cream for his recurring fungal rash.

22.     From July 25 to October 8, 2013, Williams received the same inadequate level of Diabetes medication. His blood sugar levels fluctuated wildly between the high 100s to the high 300s during those 11 weeks. Lab results signed by Schwarz on October 2 reveal that his

condition worsened further. Yet Schwarz did not adjust Williams's Insulin or otherwise change his treatment plan until October 9, 2013. Indeed, Williams's record contains no medical progress notes between July 24 and October 9, 2013.

23.     On October 9, 2013, Schwarz increased Williams's Insulin dosage to 24 units in the morning and 12 units in the evening. From October 9 to 25, 2013, Williams's blood sugar levels continued to fluctuate between 123 to 350 in the mornings, averaging 223 (outside of the Target Range), and between 114 to 216 in the evenings, averaging 164 (also outside of the Target Range). Despite Williams's consistently high blood sugar levels during that time, prompting Schwarz to write "Glucometer stable," and a hemoglobin A1c reading of 9.9% on October 17, 2013, Schwarz did not adjust his Insulin or otherwise change his treatment plan. Williams would later recall that he "cried like a baby all the time" because "nobody cared about me" while at Stateville NRC.

### Williams's Injuries

24.     On October 26, 2013, Williams arrived in the health care unit with a painful "golf ball sized" lump on the right side of his neck. The next day, Williams was admitted to the infirmary for treatment of the lump on his neck. He remained there until November 8. Williams's diagnoses revealed cellulitis, an infection of the skin and underlying tissues.

25.     Williams suffered from pain and discomfort during his admission. Specifically, He had difficulty breathing, trouble sleeping, and he felt pain during infusion of intravenous medication

26.     Additionally, beginning with and throughout the duration of his detainment at Stateville NRC, Williams experienced blurred vision, seeing "floaters," missing areas of vision, progressive vision loss, physical pain, elevated blood pressure, and extreme emotional distress.

Willaims's weight when he left Stateville NRC rose to 188lbs (36 pounds more than when he arrived there).

27.    Williams began receiving eye treatment in 2014 after his transfer from Stateville NRC to Dixon Correctional Center.

28.    In 2015, Williams received laser treatments for hemorrhages in the backs of his eyes, a feature consistent with diabetic retinopathy.

29.    Williams still suffers from vision problems to this day, including blurred vision and missing areas of vision.

### Causation

30.    Uncontrolled diabetes increases the risk of developing fungal and bacterial infections, nerve damage known as diabetic neuropathy, and significant eye complications including diabetic retinopathy.

31.    Due to Schwarz's unreasonable failure to provide Williams any care for his diabetes from March 4 to July 24, 2013, and her inadequate treatment of Williams's diabetes from July 24, 2013, until Williams's transfer to Dixon Correctional Center on or about November 25, 2013, Williams's diabetes festered uncontrolled for over eight months. As a result, Williams suffered from pain and discomfort related to his fungal infections and cellulitis, lasting diabetic neuropathy, permanent damage to his vision, and extreme emotional distress.

32.    Schwarz knew of Williams's diabetes, his mental frailties, and that depriving him of adequate care would pose a risk of serious acute and chronic physical and emotional harm.

7

## COUNT I
## FOURTEENTH AMENDMENT VIOLATIONS

33.    Williams restates and incorporates by reference the allegations of Paragraphs 1 through 32 herein.

34.    Williams brings Count II against defendant Schwarz in her individual and official capacities.

35.    Williams suffered from a serious medical need while at Stateville NRC in that he suffered from Diabetes requiring Insulin, oral diabetes medication, and/or twice daily blood sugar monitoring.

36.    Schwarz had responsibility for providing medical services at Stateville NRC and managing Williams's Diabetes. In this role, Schwarz determined whether and in what dosages Williams would receive diabetic medication. Schwarz acted under color of state law when she performed her duties.

37.    Schwarz knew, or reasonably should have known, that Williams's Diabetes constituted a serious medical need requiring treatment. Williams informed Schwarz on March 4, and 8, 2013, and on May 9, 2013, that he had Diabetes for which he took Insulin, Metformin, and performed twice daily blood sugar checks. That information is noted on his March 4, 2013, assessment and throughout volumes of medical records accessible to Schwarz. Additionally, before he received any medication for his Diabetes, Williams sent numerous sick call requests and filed at least two grievances with respect to his lack of diabetic treatment, which Schwarz received.

38.    Despite Schwarz's awareness, she was deliberately indifferent to Williams's serious medical need. In particular, Schwarz:

a. Discontinued Williams's medications upon his arrival at Stateville NRC in March 2013;

b. Refused to provide any diabetic medication to Williams until July 24, 2013;

c. Refused to check Williams's blood glucose levels from March 14 to July 25, 2013;

d. Failed to respond to Williams's requests and grievances for medical care; and

e. Failed to provide adequate diabetic treatment to Williams between March 4 and November 25, 2013.

39. As a result of Schwarz's conduct Williams suffered from pain and discomfort related to his fungal infections and cellulitis, lasting diabetic neuropathy, and permanent damage to his vision, in violation of his Fourteenth Amendment rights.

40. Schwarz's conduct toward Williams constituted deliberate indifference to and reckless disregard of his serious medical need and caused him to suffer significant and unnecessary physical injuries in violation of his Fourteenth Amendment rights.

**WHEREFORE**, Williams respectfully requests that the Court issue an order providing for:

a. Compensatory damages in excess of $50,000;

b. Punitive damages;

c. Reasonable costs and attorneys' fees under 42 U.S.C. § 1983; and

d. Such other relief as this Court may deem just, equitable, or appropriate under the circumstances.

9

## COUNT II
## MEDICAL MALPRACTICE

41.     Williams restates and incorporates by reference the allegations of Paragraphs 1 through 40 herein.

42.     Williams brings Count II against Schwarz in her individual capacity.

43.     The above described conduct of Schwarz failed to conform to the applicable standard of care in the medical community.  In particular, Schwarz:

      a.     Discontinued Williams's medications upon his arrival at Stateville NRC in March 2013;

      b.     Refused to provide any diabetic medication to Williams until July 24, 2013;

      c.     Refused to check Williams's blood glucose levels from March 14 to July 25, 2013;

      d.     Failed to respond to Williams's requests and grievances for medical care; and

      e.     Failed to provide adequate diabetic treatment to Williams between March 4 and November 25, 2013.

44.     The report of Marla Barkoff, M.D., attached hereto as Exhibit 1, demonstrates that Schwarz's conduct did not conform to the applicable standard of care in the medical community.

45.     As an actual and proximate result of Schwarz's failure to conform to the applicable standard of care in the medical community, Williams suffered from pain and discomfort related to his fungal infections and cellulitis, lasting diabetic neuropathy, and permanent damage to his vision.

10

**WHEREFORE**, Williams respectfully requests that the Court issue an order providing for:

      a.      Compensatory damages in excess of $50,000;

      b.      Punitive damages;

      c.      Reasonable costs and attorneys' fees; and

      d.      Such other relief as this Court may deem just, equitable, or appropriate under the circumstances.

### COUNT III
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

46.      Williams restates and incorporates by reference the allegations of Paragraphs 1 through 45 herein.

47.      Williams brings Count III against Schwarz in her individual capacity.

48.      As a Physician Assistant responsible for Williams's care and treatment, Schwarz owed Williams a duty not to harm him or inflict upon him any unnecessary emotional distress.

49.      By engaging in the above described conduct, Schwarz breached her duty to Williams and caused him severe emotional distress.  In particular, Schwarz breached her duty to Williams by overlooking his emotional needs, discontinuing his medications upon his arrival at Stateville NRC in March 2013, refusing to provide him with any diabetic medication until July 24, 2013, refusing to check his blood glucose levels from March 14 until July 25, 2013, failing to respond to his requests and grievances for medical care, and failing to provide him with adequate diabetic treatment from March 4 to November 25, 2013.

50.      By engaging in the conduct described above, Schwarz at the very least negligently caused Williams severer emotional distress.

**WHEREFORE**, Williams respectfully requests that the Court issue an order providing for:

a.      Compensatory damages to be determined at trial;

b.      Punitive damages to be determined at trial;

c.      Reasonable costs and attorneys' fees; and

d.      Such other relief as this Court may deem just, equitable, or appropriate under the circumstances.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

51.      Williams restates and incorporates by reference the allegations of Paragraphs 1 through 50 herein.

52.      Williams brings Count IV against Schwarz in her individual capacity.

53.      The above described conduct of Schwarz intentionally caused Williams severe emotional distress. In particular, Schwartz engaged in extreme and outrageous conduct toward Williams by being indifferent to his emotional needs, discontinuing his medications upon his arrival at Stateville NRC in March 2013, refusing to provide him with any diabetic medication until July 24, 2013, refusing to check his blood glucose levels from March 14 until July 25, 2013, failing to respond to his requests and grievances for medical care, and failing to provide him with adequate diabetic treatment from March 4 to November 25, 2013.

54.      By engaging in the extreme and outrageous conduct described above, Schwarz intended to inflict severe emotional distress on Williams. At the very least, Schwarz knew that there was a high probability that her conduct would inflict severe emotional distress on Williams.

55.      Schwarz's extreme and outrageous conduct as described above directly and proximately caused Williams severe emotional distress.

12

**WHEREFORE**, Williams respectfully requests that the Court issue an order providing for:

a.  Compensatory damages to be determined at trial;

b.  Punitive damages to be determined at trial;

c.  Reasonable costs and attorneys' fees; and

d.  Such other relief as this Court may deem just, equitable, or appropriate under the circumstances.

Dated:  April 25, 2017

Respectfully submitted,

WILLIAM WILLIAMS

By:     */s/ Giel Stein*
        One of His Attorneys

Royal B. Martin (01782797) rmartin@clarkhill.com
Giel Stein (6275990) gstein@clarkhill.com
Courtney R. Posnik (6316758) cposnik@clarkhill.com

CLARK HILL PLC
130 E. Randolph Street
Suite 3900
Chicago, IL 60601
T: (312) 985-5900
F: (312) 985-5979

13

# Exhibit 1

February 27, 2017

Giel Stein, Esq.
Clark Hill, PLC
130 E. Randolph Street
Suite 3900
Chicago, Illinois 60601

RE:    **William Williams v. Mary Diane Schwarz, P.A. Case No. 1:15-CV-01691**

## RELIANCE MATERIALS

1.    Mr. Williams's Joliet Correctional Center medical records 8/1/97-8/4/97;

2.    Mr. Williams's Sheridan Correctional Center medical records 8/12/97-12/28/98;

3.    Mr. Williams's Graham Correctional Center medical records 3/21/00-4/11/00;

4.    Mr. Williams's Danville Correctional Center medical records 2000, 2002, 2005-2006;

5.    Mr. Williams's Henry Hill Correctional Center medical records 1/10/06-6/8/06;

6.    Mr. Williams's Stateville Correctional Center medical records 4/3/09-4/14/09;

7.    Mr. Williams's Shawnee Correctional Center medical records, including progress notes, glucometer results, Eye exams, and Medication Administration Record 4/15/09- 6/14/12;

8.    Mr. Williams's Stroger Hospital inpatient records and discharge summary 8/4/12-8/7/12;

9.    Mr. Williams's Cermak Health Services intake note 3/2/13;

10.   Mr. Williams's Stateville Correctional Center medical records, including progress notes, infirmary admission, glucometer results, and Medication Administration Records 3/4/13- 11/25/13;

11.   Mr. Williams's Dixon Correctional Center medical records, including progress notes, Optometric exams, and Medication Administration Records 11/25/13 – 12/17/14;

12.   Mr. Williams's East Moline Correctional Center medical records 2015, including examination by retinal specialist Dr. Han on 4/2/15;

13.   Illinois Eye Center exam March, May, September 2015;

14.   Defendant Schwarz's responses to plaintiff's first set of Requests For Production (RFP) September 2016;

15.   Telephone interview with Mr. William Williams, 2/27/17;

1

16      Illinois Department of Corrections Office of Health Services Chronic Illness Treatment
        Guidelines Diabetes June 2012;

17.     Wexford Medicine in Corrections Employee Handbook, revised 9/1/04;

18.     Wexford Health Sources Incorporated Medical Policies and Procedures Region: Illinois,
        Endocrine/Metabolic Disorders Effective date 10/21/11;

19.     American Diabetes Association Standards of Medical Care in Diabetes. Diabetes Care,
        volume 36, S11-S66, January 2013; and

20.     American Diabetes Association Diabetes Management in Correctional Institutions,
        Diabetes Care, volume 36, S86-S92, January 2013.

        My opinions and conclusions are rendered to a reasonable degree of medical and
professional certainty.

## EXECUTIVE SUMMARY

        Between March 4, 2013 and November 25, 2013, Mr. Williams was under the care of the
medical professionals at Stateville Correctional Center, which included physician assistants,
nurses, and physicians.  During his stay at Stateville Correctional Center, his medical care
substantially departed from accepted professional judgment, standards, and practice when
treating Mr. Williams's diabetes and complications related to diabetes.  Specifically, Mr.
Williams's primary medical team practitioner, Mary Diane Schwarz, P.A., failed to properly
manage Mr. Williams's glycemic control, failed to recognize the impact of her poor clinical
management on poor health outcomes, and failed to properly prevent and treat complications
from diabetes, including problems with Mr. Williams's recurrent infections, peripheral
neuropathy and developing retinopathy.

## QUALIFICATIONS

        I earned a Bachelor of Arts degree in 1998 from the University of Pennsylvania where I
studied Anthropology.  After college, I moved to Dakar, Senegal, West Africa to conduct
research in the field of Hepatitis B.  Specifically, for two years, from 1998-2000, I worked with
the Senegalese Army on a joint research study with Fox Chase Cancer Center to investigate the
role of Hepatitis B in the development of liver cancer in Senegalese men.

        I graduated from the Boston University School of Medicine in 2004 with a Doctor of
Medicine (M.D.) degree.  My clinical training centered on the care of patients at Boston Medical
Center, which services Boston's indigent and underinsured population.  Over 70% of Boston
Medical Center's patients come from underserved communities.  This environment allowed me
to observe that the medical care of patients from diverse socioeconomic backgrounds should be
as equal as possible.

        I was then a resident in Internal Medicine at Brown University in Providence, Rhode
Island from 2004-2007.  During my residency, my main focus of work was at Rhode Island
Hospital, which is the state's largest general acute care hospital.  My medical work often

involved caring for patients who were uninsured, homeless, or incarcerated. It was during my residency that I developed an interest in the field of Endocrinology.

In 2007, I began my fellowship in Endocrinology, Diabetes, and Metabolism at the University of Chicago. During this specialty training, approximately 60% of the patient referrals I received were for Diabetes Mellitus consultations. I was responsible for managing diabetes and its complications both in the inpatient acute setting as well as the outpatient continuity clinic. During my two years of Endocrine subspecialty training, I gained great insight into the multidisciplinary approach required to adequately care for people living with diabetes. Great focus was placed on the essential roles that nutrition and patient education play in the comprehensive care of patients with diabetes. In addition, the importance of glycemic control to prevent or mitigate long-term complications was an essential theme.

After completing my fellowship in 2009, I began working at Mount Sinai Hospital in Chicago as an Attending Endocrinologist. The patients I cared for at Mt. Sinai Hospital were mostly African American and Hispanic, most of whom had Diabetes Mellitus. I also worked as an Endocrinologist at Touhy Health Center caring exclusively for refuges, mostly from Bosnia, Iraq, and Southeast Asia. In the four years that I worked at Mount Sinai Hospital and Touhy Health Center, I served as a general endocrinologist, and approximately 50% of my patients came to me for diabetes management.

In February 2014, I was recruited to join the faculty of the University of Illinois at Chicago's Division of Endocrinology, Diabetes, and Metabolism where I served as an Assistant Professor of Clinical Medicine. My patients were diverse in terms of race, ethnicity, economic backgrounds, and social support networks. I cared for patients currently incarcerated who were referred for specialty diabetes care as well as other general endocrinology evaluations. Incarcerated patients were cared for in my clinic by a diabetes team that included myself, a nurse, a diabetes educator, and a dietitian. Often incarcerated patients return for follow-up diabetes care every 3 months. Referrals are made for additional specialty care including ophthalmology and podiatry, as well as nephrology and cardiology when indicated.

In December 2016, I opened my own medical practice focused on Endocrine disease.

I am board certified in Internal Medicine and Endocrinology, Diabetes, and Metabolism. My additional qualifications are found in my attached curriculum vitae.

## FACTUAL BACKGROUND

1.      Mr. Williams was diagnosed with Diabetes Mellitus on September 12, 1993 at the age of 43 while incarcerated at Cook County Jail. He reports symptoms of polyuria, light-headedness, and diaphoresis with a accompanying blood glucose of 618mg/dL. He has a family history notable for a grandmother with Diabetes Mellitus. His diabetes was initially medically managed with Glucotrol 10mg daily (oral sulfonylurea), but in 1994, one year after diagnosis, he was started on insulin therapy. He was prescribed insulin, usually mixed insulin 70/30 twice daily, during the course of multiple incarcerations prior to his arrival at Stateville Correctional Center in 2013. When he was not incarcerated, Mr. Williams would self-administer insulin.

2.      Glucose logs from October 2005- January 2006 on NPH insulin twice daily while Mr. Williams's was an inmate at Danville Correctional Center revealed an average daily glucose level of 117mg/dL with glucose level > 200mg/dL only twice in a 3-month period. On 11/11/05, labs revealed a Hemoglobin A1c of 7.2%, urine microalbumin/creatinine ratio was 10.5 (normal < 30), and LDL 94.

3.      In January 2006, while an inmate at Hill Correctional Center, documented physical exam revealed no focal neurologic deficits and intact pulses. In May 2008, dilated eye exam with ophthalmology revealed no diabetic retinopathy.

4.      On 4/3/09, while an inmate at Stateville NRC, Mr. Williams was examined by Mary Diane Schwarz, P.A. Glucose level recorded as 320mg/dL. She documented a history of Type 2 Diabetes Mellitus since 1993 and an average glucose of 280mg/dL. She states he was on Glipizide 20mg daily and Metformin 1000mg twice daily. She documents "will switch to insulin." Ms. Schwarz prescribed Novolin 70/30 insulin 28 units in the morning and 12 units in the evening. The Medication Administration Record indicates that his insulin doses were administered at 4am and 4pm daily. Mr. Williams was transferred to another facility two weeks later where records indicate twice daily 70/30 insulin was administered through January 2011.

5.      In 2009, while an inmate at Shawnee Correctional Center, Mr. Williams began to develop symptoms of neuropathy described as a buzzing or vibratory sensation. Three years later, in 2012, he was prescribed Neurontin with mild clinical benefit. Neuropathy progressed and Mr. Williams reported

6.      Optometry exam performed 11/24/09 revealed no diabetic retinopathy. Surveillance dilated eye exam on 5/25/10 again revealed no diabetic retinopathy.

7.      While incarcerated at Shawnee Correctional Center from 2011-2012, his medical records including progress notes and Medication Administration Records consistently indicate that he was prescribed mixed Insulin 70/30 twice daily. He was evaluated three times per year in the Chronic Diabetes Clinic (January, May, and September 2011) as well as the Chronic Hypertension Clinic. Optometry clinic note from 5/24/11 reported "Negative DM retinopathy." At the time of release from Shawnee in November 2012, Mr. Williams had been receiving Humulin Insulin 70/30 75 units at 4pm daily from 5/8/12-11/8/12.

8.      On 3/2/13, Mr. Williams presented to Cermak Health Services for evaluation and management of his Diabetes Mellitus and Hypertension. The physician's progress note indicates that Mr. Williams was taking mixed insulin 70/30 at home (7 units in the morning and 15 units at night) in addition to Metformin 500mg twice daily to manage his Diabetes. Medical history also documented use of Neurontin for lower extremity "nerve pain," Enalapril to manage his blood pressure, and Tramadol use for chronic low back pain. His glucose level at that visit was 196mg/dL (elevated) and BP 145/76 mmHg (elevated).

9.      On 3/4/13, Mr. Williams entered the Illinois Department of Corrections Stateville Correctional Center. At 2:30pm, C. Smith, RN documented an Offender Medical History including Mr. William's history of Diabetes Mellitus for which he took Insulin 70/30 15 units in the morning and 7 units at night in addition to Metformin 500mg twice daily. History does not

include classification of diabetes type, age of diabetes onset, diet history, glucose monitoring history, prior episodes of hypoglycemia, or history of diabetes-related complications. The Subjective section to evaluate a disability in vision was left blank. Vital signs recorded include blood pressure (BP) 139/83, weight 152 pounds, but no calculation of Body Mass Index (BMI). She recorded a glucose level of 223mg/dL (elevated). The nurse's assessment documents "Diabetes- Insulin 70/30 + PO meds, Accucheck 223." Medical history documentation also included a history of depression and previous suicide attempt in 1980. Ms. Smith recommended an urgent mental health referral.

10.    On 3/4/13 at 4:00pm, 90 minutes after his initial medical history review in which his glucose was found to be elevated at 223mg/dL, Mr. Williams was evaluated by Mary Diane Schwarz, P.A. Ms. Schwarz documents she reviewed his medical history but indicates she did not review any laboratory data. Her physical exam indicates a cardiac exam in regular rhythm, palpable peripheral pulses 2+/2, but no distal extremity sensory exam was documented. No BMI calculated or reported as part of his exam. Her assessment indicates Diabetes Mellitus type 2 for 20 years as a medical problem, in addition to polysubstance abuse and Hepatitis C virus. There is no mention of his history of depression and suicide attempt in her problem list. Her medical plan for management of his Diabetes Mellitus consists of ordering glucometer testing twice daily. His chronic Metformin medication is not prescribed. His chronic insulin is not prescribed. In fact, she writes "WANTS INSULIN??" and writes "No insulin repeat glucometer 180mg/dL at 5pm." As she had indicated she did not review lab data, there is no instructions to collect lab data as dictated by IDOC guidelines for management of patients with Diabetes Mellitus. Her medical plan is devoid of patient education or instruction for a medically appropriate diabetic diet, foot care, discussion of symptoms of hypoglycemia or hyperglycemia, or screening for diabetic complications. No order placed for fundoscopic exam. No mention that Mr. Williams's BP is above goal outlined in IDOC guidelines or mention of consideration for prescribing antihypertensive agent to achieve BP control. His longstanding ACEI (Enalapril) was discontinued upon arrival. No reference made to ordering a lipid panel or using a lipid-lowering medication. In the face of chronic neuropathy, Mr. Willaims' long-standing Neuronbtn orer was not continued itehr upon arrival. In the absence of a special medical diet order, Mr. Willlaims was given donuts, cereal, and grits for breakfast, stew with vegetables and bread for lunch, and hot dogs, beans, and vegetable for dinner. A snack consisted of crackers and orange juice. Ms. Schwarz recommended follow-up with her on March 5th or March 6th.

11.    On 3/4/13, medical labs ordered by Dr. Saleh Obaisi reveal a glucose of 204 mg/dL (elevated). Lab report does not include Hemoglobin A1c, lipid panel, TSH, or urine microalbumin. Serum creatinine level normal at 0.98 mg/dL. Of note, he is also found to have an elevated serum calcium level at 10.9 mg/dL (normal reference range 8.6-10.6mg/dL) without medical documentation of this abnormality or plan for investigation. Signature on the two lab documents appears similar to Ms. Schwarz's signature on other documents throughout the medical record.

12.    On 3/6/13, Mr. Williams underwent a Mental Health Evaluation, reporting prior treatment for depression and anxiety. Depression initially at age 25, with former treatment at both Madden MHC and Reed MHC. Mr. Williams admitted to previous attempt to harm himself in 1989. No current thoughts of self-harm.

13.     On 3/8/13, Mr. Williams was examined by Mary Diane Schwarz, P.A. for follow-up of his Type 2 Diabetes Mellitus. She recorded "on no medication here." Glucometer 158mg/dL. Exam revealed tinea cruris on inner thighs and scrotum. Plan appears to indicate that follow-up is as needed (PRN).

14.     Mr. Williams undergoes twice daily glucose testing from 3/6/13-3/14/13. Average morning glucose was 110mg/dL (range 87-133mg/dL). Average evening glucose level was 149mg/dL (range 100-193mg/dL). After 3/14/13, glucose testing ceased without explanation or documentation of change in care.

15.     No medical professional evaluates Mr. Williams from 3/8/13-5/9/13. During this time period, Mr. Williams repeatedly requested a medical diabetes diet, both verbally and through the formal request slip process, but he was told that only religious reasons and severe hypertension would warrant a specialty diet. During this time period as well, in April 2013, Mr. Williams begins to develop changes in his right eye vision, described as "blotches," for the first time. He recalls that he frequently reported these vision changes, but no referral to an eye specialist was made.

16.     On 5/7/13, Mr. Williams files an IDOC Offender's Grievance. Mr. Williams writes that he entered Stateville NRC on 3/4/13 and at that time was examined by D. Schwarz. He states that he explained to her that he suffered from Diabetes, ruptured disc, and high blood pressure. He gave her his prescriptions and recalls she immediately stated "I don't believe you took this medication before you arrived here." Mr. Williams also writes in his complaint that "med staff here at Stateville refuses to monitor my blood sugar or blood pressure. I explained to them that changes have occurred in my body and I get symptoms of hypoglycemia several nights a week." Emergency Review of Mr. Williams's 5/7/13 grievance took place on 5/23/13 by Michael Lemke.

17.     On 5/9/13, Mary Diane Schwarz, P.A. evaluated Mr. Williams for a complaint of back pain. At 7:00am, Mr. Williams complained of back pain and needed something as he was going to court. Schwarz ordered Tramadol. Officer brought Mr. Williams up by wheelchair-Schwarz writes "unclear why". Mr. Williams is described as being curled over in a wheelchair. Ms. Schwarz asked why he didn't put in for sick call if he was in pain. By 7:30am, Ms. Schwarz documents, "He then says that I told him that I didn't believe him about his back. I checked his chart and what I didn't believe he was on insulin. I told him no insulin … I got his records. His records … he was never on insulin. His back was barely discussed." Of note, on 4/3/09, Mary Diane Schwarz, P.A. evaluated Mr. Williams at Stateville Correctional Center and started him on twice daily mixed insulin. Since Ms. Schwarz's prescription of insulin in April 2009, multiple sequential medical records from various Illinois correctional centers reveal consistent daily insulin prescription. Her plan on 5/9/13: Follow-up as needed (PRN) and Robaxin.

18.     No medical professional evaluated Mr. Williams between 5/9/13-7/24/13.

19.     On 7/24/13, 10 weeks after filing his grievance, Mr. Williams was evaluated by Mary Diane Schwarz, P.A. She records "patient filed grievance secondary to his insulin. Once again, his glucometer x 10 days < 100 (BID)." She then writes "No insulin on streets secondary to homeless; lost to follow-up, no complaints to anyone." During this evaluation, Mr. Williams

undergoes 3 glucometer tests, all of which are in the glucose toxic range > 300mg/dL, with the highest reading being 426mg/dL. In the setting of severe glucose toxicity, Ms. Schwarz prescribed 5 units of regular insulin to be given x 1 dose and then starts maintenance basal insulin as NPH 10 units twice daily (morning and bedtime). No mealtime insulin coverage is prescribed. She writes for glucose monitoring twice daily. She orders labs including a Hemoglobin A1c, basic chemistries, urinalysis, and a complete blood count. Neither a urine microalbumin nor a lipid panel were ordered. Tinea cruris is again noted during this examination; Nystatin prescribed.

20. On 7/25/13, labs ordered by and signed by Mary Diane Schwarz, P.A. reveal a serum glucose of 295mg/dL, a Hemoglobin A1c value of 9.1% (equates to an average glucose of 210-220mg/dL), and a urine glucose of 1000mg/dL. Within the first week of starting NPH twice daily, average morning glucose 212mg/dL (IDOC guidelines dictate preprandial goal 90-130mg/dL), and average evening glucose 224mg/dL (IDOC guidelines dictate peak postprandial glucose 180mg/dL). Despite these findings, no escalation in diabetes care is made. The medical record does not indicate that any effort was made to refer Mr. Williams to a diabetes specialist, request him a diabetic diet, or screen him for microvascular complications of hyperglycemia (no dilated eye exam, neuropathy exam, or proteinuria investigation were performed).

21. In August 2013, while patient received NPH Insulin 10 units twice daily, he underwent glucometer testing twice daily. Average morning glucose 198mg/dL (> 150mg/dL on 22/30 days with overall range 99-309mg/dL) with IDOC guidelines dictating his preprandial glucose goal be 90-130mg/dL. Average evening glucose 207mg/dL (> 200mg/dL on 13/30 days with overall range 136-298mg/dL) with IDOC guidelines dictating glucose peak postpradial being 180mg/dL. Patient had 100% adherence receiving his twice daily NPH insulin injections.

22. In September 2013, while patient received NPH Insulin 10 units twice daily, he underwent glucometer testing twice daily. Average morning glucose 246mg/dL (> 150mg/dL on 27/29 days with overall range 140-380mg/dL) with IDOC guidelines dictating preprandial glucose goal 90-130mg/dL. Average evening glucose 260mg/dL (> 200mg/dL on 25/30 days with overall range 167-457mg/dL) with IDOC guidelines dictating peak postprandial glucose level < 180mg/dL. Patient had 100% adherence receiving his twice daily NPH insulin injections.

23. On 10/2/13, labs signed by Mary Diane Schwarz, P.A. reveal a serum glucose of 319mgdL, and A1c of 9.9% (equates to an average glucose of 240-250 mg/dL), and a urine glucose of 1000mg/dL. Despite clear worsening in Mr. Williams's diabetes control, Ms. Schwarz makes no escalation in his diabetes management. The medical record does not show that Ms. Schwarz made any effort to refer Mr. Williams to a diabetes specialist, request a diabetic diet, or screen him for microvascular complications of worsening hyperglycemia (no dilated eye exam, neuropathy exam, or proteinuria investigation were performed).

24. Despite initiation of basal insulin by Mary Diane Schwarz, P.A. on 7/24/13 and labs on 10/2/13 reflecting worsening glucose control, no medical progress note recorded between 7/24/13 – 10/9/13. During this time period of worsening glucose elevation, Mr. Williams describe significant emotional distress, reporting "I cried like a baby all the time" because "nobody cared about me" while at Stateville Correctional Center. .

25. In early October 2013, while patient received NPH Insulin 10 units twice daily, he underwent glucometer testing twice daily from 10/1/13-10/9/13. Average morning glucose 354mg/dL (> 150mg/dL on 9/9 days with overall range 244-451mg/dL) and average evening glucose 299mg/dL (> 200mg/dL on 8/8 days with overall range 244-371mg/dL). Patient had 100% adherence receiving his twice daily NPH insulin injection.

26. On 10/9/13, Mary Diane Schwarz, P.A. evaluates Mr. Williams for follow-up of his Type 2 Diabetes Mellitus. She records "insulin requiring with increasing glucometers." Patient also documented to be complaining of shooting back pain. Blood pressure 167/83 (elevated). Physical exam indicates peripheral pulses +1/2 (pulses were +2/2 during intake exam on 3/4/13), no sensory exam performed. New medical plan indicates stopping NPH insulin and starting Novolin 70/30 "24 units qAM, 12 units qPM." In the Medication Administration Record, Novolin insulin timed for AM and HS. Episodic candida listed in his assessment with Nystatin and Triamcinolone creams prescribed. In addition, Mr. Williams is started on Lisinopril 20mg daily, ordered for Optometry, and Education performed.

27. On 10/17/13, at the time of Mary Diane Schwarz's medical progress note, Mr. Williams's glucose level was 235mg/dL (elevated). Ms. Schwarz's documentation states 'Glucometer stable." Her medical assessment reads "Stable except Hemoglobin A1c 9.9." Her medical plan reads "Diabetes Clinic."

28. In the two weeks following initiation of Novolin insulin 70/30 24 units dosed in the morning and 12 units dosed at bedtime, Mr. Williams average morning glucose was 218mg/dL (>150mg/dL on 14/15 days) with IDOC guidelines dictating preprandial glucose goal 90-130mg/dL. His average bedtime glucose was 149mg/dL.

29. On 10/25/16, Mr. Williams morning glucose level was 332mg/dL.

30. On 10/26/13, Mr. Williams presented to the HCU with complaints of acute onset throat swelling and a painful right submandibular lump. BP 190/91 (elevated), Oxygen saturation 98%, Temp 98.6. He was evaluated by an RN who documents no shortness of breath and no obstruction or swelling noted in the airway. Medical assessment reads "submandibular swelling." Medical plan indicates "return to HCU as needed (PRN). Evening pains med to be taken. Sick call 10-28-13."

31. The following day, on 10/27/13 at 1:40am, Mr. Williams reported 'My throat hurts, I can't swallow." Physical exam by Coleman CNII documented a "growth right side of neck 2cm x 2cm no open area, non-movable mass. A foul odor noted from mouth." Dr. Funk's orders were to measure growth every 4 hours and call MD if increase by 20%. Patient was admitted to infirmary for 23-hour observation. At 3:30am, he was given Tylenol 650mg for pain.

32. On the same day 10/27/13 at 10:40am, Mr. Williams temperature was elevated to 100.6 degrees. RN note indicates that MD was notified with order to give Motrin and keep monitoring.

33. On 10/28/13 at 5am, Mr. Williams reported to a nurse that there was discharge coming out of his mouth, revealing a tissue with yellowish pus which he reported came out of his

neck and mouth. The progress note documents that Mr. Williams was unable to open his mouth due to discomfort. Plan: patient advised to rinse mouth after meals and continue to monitor.

34.     On 10/28/13, Mr. Williams is evaluated by a medical doctor. This is the first M.D. note in Mr. Williams chart since arriving to Stateville on 3/4/13. The physician notes a diagnosis of right neck cellulitis with a history of Diabetes Mellitus. Medical plan includes blood and throat cultures, a chest xray, a CT scan of the neck with contrast, a complete blood count lab, and initiation of IV fluid and IV antibiotics. Patient received IV antibiotics from 10/28/13 – 11/7/13. During this treatment for acute infection, no glucose level recorded. Mr. Williams was discharged from the infirmary back to NRC on 11/8/13 on oral antibiotics for 10 days.

35.     On 11/25/13, Mr. Williams is transferred to Dixon Correctional Center. Labs on 11/29/13 revealed Glucose 185, A1c 9.1%, Lipids (TC 150, TG 61, HDL 54, LDL 84). On 12/17/13 at Dixon, he underwent a focused diabetes and cardiovascular evaluation and his weight was recorded as 188 pounds (calculated BMI 24.8), which is 36 pounds heavier than when he entered Stateville nine months prior. He was also reported to have "numbness/tingling pain in his legs" on physical exam. In addition to insulin therapy, he was prescribed a low sugar and low fat diet, received education on daily foot care, was recommended to participate in daily exercise and received education on signs/symptoms of hypo/hyperglycemia.

36.     On 2/3/14, a sick call note at East Moline Correctional Center records that Mr. Williams was complaining of "issues reading and is having problems with vision in his right eye."

37.     On 3/18/14, Mr. Williams underwent an Optometric Exam and was diagnosed with retinopathy and macular area changes in the right eye.

38.     In April 2014, Mr. Williams undergoes ophthalmologist evaluation by a retinal specialist and is found to have diabetic macular edema (right eye) with a background of diabetic retinopathy (both eyes).

39.     On 7/18/14, while incarcerated at Dixon Correctional Center, Mr. Williams files a grievance requesting the administrative review board "take action against Dr. Diane Schwarz." In his grievance, Mr. Williams states that when he entered Stateville Correctional Center on 3/4/13, his paperwork included prescriptions written by Dr. Terrance Baker on 3/2/13 for Metformin 500mg tablets, Gabapentin 300mg tablets, and Tramadol 50mg tablets. Mr. Williams explains that he gave Ms. Schwarz these prescriptions when she examined him on 3/4/13. Mr. Williams claims that during this intake exam, Ms. Schwarz stated "I don't believe you took these medications before you arrived here." Mr. Williams describes additional requests for his diabetes medications, including insulin, which went unanswered. He writes that on 7/24/13, when his glucose level was greater than 400mg/dL, this was the first time since his 3/4/13 arrival to Stateville that he was given medication to manage his diabetes. He states "I continued to struggle with for the next couple of months." He reports that 2-week treatment course for the neck cellulitis he suffered from in October 2013. He then states, "I have bleeding behind my right eye, I have peripheral neuropathy, I have fungus in my crotch area." He summarizes that "I don't believe I would be suffering like this if Dr. Schwarz had took the time to check my medical

history and went in the right direction concerning my medical problems. Four and one half months is too long for a diabetic to go without insulin. Also, Dr. Schwarz failed to medicate me for hypertension. She also failed to check my blood pressure on a semi-regular basis. I have done the best I can to exhaust my remedies." Mr. Williams's grievance was deemed outside the jurisdiction of the facility and was recommended to be sent to the administrative Review board in Springfield, IL.

40.    On 12/17/14 during a chronic clinic note at East Moline Correctional Center, Mr. Williams states he "can't see" from his right eye for 3 months. By March 2015, Mr. Williams reports seeing "floaters" in his vision. In May 2015, he begins steroid injections into his right eye for management of diabetic macular edema. In June 2015, he underwent laser therapy to his right eye. Unfortunately, in September 2015 at his Ophthalmology follow-up appointment, Mr. Williams reports his vision continues to worsen.

41.    In September 2016, in response to Mr. Williams's first set of Requests For Production regarding Wexford and IDOC policies and procedures for the treatment of Diabetes Mellitus, vision condition, and bacterial/fungal infections (Question 12), Mary Diane Schwarz, P.A. states that Wexford guidelines are "never a substitute for practitioner's medical judgement and subordinate to any IDOC administrative or institutional directives."

## METHODOLOGY

When evaluating Mr. Williams's medical care during his incarceration at Stateville Correctional Center under Mary Diane Schwarz's care from March 2013 through November 2013, I first determined the applicable standard of care, using my professional judgment, training, and experience. I considered the medical standards of care set forth by the American Diabetes Association's ("ADA") Position Statements related to Standards of Medical Care in Diabetes and   Diabetes Management in Correctional Institutions. To determine the standard of care at the time that Mr. Williams arrived at Stateville Correctional Center, I referenced the ADA's January 2013 statements, which were the most recent position statement at the time of his arrival To Stateville Correctional Center in March 2013. I incorporated the medical standards of care dictated by the Illinois Department of Corrections and which dictate the care Mr. Williams should have receive during his time at Stateville Correctional Center under Ms. Schwarz's care. I then determined Mr. Williams's actual medical treatment using the Stateville Correctional Care medical records, including progress notes, medication Administration Records, and filed grievances. Finally, I compared the conduct (or lack thereof) of the Physician Assistant Mary Diane Schwarz responsible for Mr. Williams's care to the standard of care dictated by the above authoritative sources, both from her written medical documentation and her personal responses to the plaintiff's Requests For Production.

With respect to damages, I used differential diagnoses to consider causes of Mr. Williams's harm. Specifically, I determined Mr. Williams's harm based on the medical records documentation prior to incarceration at Stateville Correctional Center in 2013, during his incarceration there, and then documentation of his health status in years following his transfer from Stateville to other correctional centers. I then used my professional judgment, training, experience, and established medical guidelines to rule out other causes of Mr. Williams's harm and to determine whether Ms. Schwarz's sub-standard care directly caused Mr. Williams's harm.

## OPINIONS

1. Mr. Williams has Type 2 Diabetes Mellitus, which was diagnosed at age 43, approximately 20 years prior to entering Stateville Correctional Center in 2013. When he arrived at Stateville Correctional Center in March 2013, his diabetes was a chronic progressive disease that required continued comprehensive treatment and prevention of chronic complications. Without proper treatment and surveillance, Mr. Williams's diabetes would worsen and lead to irreversible medical and emotional damage.

2. IDOC Guidelines, Wexford Algorithms, and ADA Standards of Care clearly outline that diabetes treatment requires a comprehensive approach to include a patient's nutrition, education, self-management tools, blood sugar monitoring, adequate and safe glucose management, and screening for complications of diabetes. In addition, the American Diabetes Association also publishes a standard of medical care for patients with diabetes in correctional facilities, which mandates that "[p]eople with diabetes in correctional facilities should receive care that meets national standards." In my own medical practice and the practice of my colleagues, treatment of incarcerated patients should be equivalent to the medical care given to non-incarcerated individuals.

3. The accepted professional practice for treating patients with diabetes is to ask the patient about their current diet at the initial consultation and subsequent visits because knowing a patient's current diet is vital to providing both effective nutrition counseling and prescribing the appropriate medical diet. In addition, IDOC guidelines specifically mandate that diet investigation be included in the baseline medical history taken upon arrival to an IDOC facility. There is no documentation in the reviewed medical record from Stateville Correctional Center that any medical professional, especially his primary provider Mary Diane Schwarz, P.A., asked Mr. Williams about his diet. Without obtaining a dietary history from Mr. Williams, Ms. Schwarz's medical conduct was below the standard of care.

4. For all people with Type 2 Diabetes Mellitus, Medical Nutrition Therapy (MNT) is an important aspect of managing their disease. For patients with Type 2 diabetes, balanced nutrition and weight maintenance are the cornerstones to preventive care. The ADA recommends that people with Type 2 diabetes limit their carbohydrate intake to 130g per day. In addition, the recommendation is to limit saturated fats and cholesterol to reduce the risk of cardiovascular disease, a known complication of diabetes. The ADA also recommends that in correctional institutions, "[t]he easiest and most cost-effective means to facilitate good outcomes in patients with diabetes is instituting a heart-healthy diet as the master menu." During Mr. Williams's incarcerations at IDOC facilities prior to his arrival to Stateville Correctional Center, notably at Shawnee Correctional Center from 2011-2012, Mr. Williams was prescribed a low carbohydrate and low salt diet.

5. Upon his arrival to Stateville Correctional Center on 3/4/13, the medical intake performed by Physician Assistant Mary Diane Schwarz gave no recommendation for Medical Nutrition Therapy. Ms. Schwarz could not have been exercising medical judgment when she failed to prescribe a medical diet. In addition, Ms. Schwarz's failure to prescribe Mr. Williams an appropriate medical diet put Mr. Williams at risk for immediate and long-term complications of variable blood sugar levels.

6.     Weight gain contributes to further insulin resistance in people with Type 2 Diabetes Mellitus. This additional weight burden further depletes remaining pancreatic function and may place added physiologic stress on cardiovascular and renal function. Every effort should be made to maintain (or reduce as indicated) a person's weight with Type 2 Diabetes Mellitus. During his 10-month incarceration at Stateville Correctional Center (March-November 2013), records show that Mr. Williams gained 36 pounds. During his intake exam on 3/4/13, his weight is recorded to be 152 pounds. His weight soon after transfer to Dixon Correctional Center in December 2013 is recorded as 188 pounds. Following the initial recording of Mr. Williams's weight at intake, his weight was never again recorded or mentioned by Ms. Schwarz during her care of him over 9 months. Ms. Schwarz's lack of weight monitoring is in direct opposition to clear IDOC guidelines. Ms. Schwarz's failure to prescribe an appropriate diet for Mr. Williams and failure to provide any formal exercise instruction or education likely contributed to his 36# weight gain under her care. The failure to monitor his increasing weight gain and failure to provide lifestyle changes to mitigate this weight gain is a substantial departure from accepted professional standards, including Ms. Schwarz's governing guidelines instituted by Wexford and IDOC.

7.     In the context of known diabetes physiology, at the time Mr. Williams was diagnosed with Type 2 Diabetes Mellitus in 1993, he had likely already lost half of his insulin-secreting pancreatic function. Progressive insulin secretion loss is reflected by the fact that Mr. Williams began requiring insulin less than 10 years after his diagnosis of Diabetes Mellitus. Once a person begins requiring insulin to manage adequate glucose control, in the absence of major lifestyle change or bariatric surgery, a person is anticipated to require insulin lifelong without interruption. Indeed, IDOC documents dating back to 2000 show that Mr. Williams was prescribed insulin during multiple and continuous incarcerations. Even Ms. Mary Diane Schwarz herself recommended insulin therapy during his previous incarceration at Stateville in April 2009.

8.     On 3/4/13, Ms. Schwarz's medical plan includes the phrase "WANTS INSULIN??" Her capitalization and multiple question marks, in my opinion, takes on a mocking tone towards Mr. Williams and denigrates his own medical judgement of himself and his own medical history. Review of the medical record indicates that he notified Ms. Schwarz of his chronic insulin utilization and had requested to continue on insulin therapy while at Stateville Correctional Center. Her blatant disregard for his critical request for insulin and even flippant notation questioning his request for insulin is a reflection of her deliberate indifference to Mr. Williams's well-being.

9.     There is no medical justification for Ms. Schwarz's discontinuation of Mr. Williams's chronic insulin therapy upon arrival to Stateville Correctional Center on 3/4/13. It is very clearly documented that Mr. Williams had been on chronic insulin therapy for greater than 13 years, and his glucose upon arrival to Stateville of 223mg/dL further signifies the need to continue his chronic insulin therapy. A repeat glucose at 5pm on day of intake of 180mg/dL, does not, in direct contradiction to her medical justification, indicate that Mr. Williams does not require insulin therapy. In fact, a glucose level greater than 180mg/dL, which Mr. Williams clearly had at intake and again reflected on labs drawn and signed by Ms. Schwarz, is a clear indication for starting medication therapy as outlined in Wexford Guidelines. Unfortunately for Mr. Williams, no such medication was prescribed.

10.     A medical practitioner who claims there is no need for insulin in a person who has been on insulin for over 13 years and who presents to intake with a glucose level of 223mg/dL, does not, in my professional opinion, understand the biology of Diabetes Mellitus or have the medical capacity to care for his chronic and complicated diabetes health. As such, she should not have been the sole medical practitioner of Mr. Williams's medical care while at Stateville as was the case from March 2013 until his admission to the infirmary in October 2013 for an acute infection. Instead, Ms. Schwarz should have referred Mr. Williams to a comprehensive Diabetes Care Clinic either at Stateville Correctional Center or at an outside institution. No such referrals for specialty care were made.

11.     Glucose monitoring is a critical aspect of assessing and achieving glucose control in a person with Diabetes Mellitus. Based on the degree of poor glucose control upon arrival, a medical order was placed by Ms. Schwarz to check Mr. Williams's glucose twice daily. From 3/6/13 – 3/14/13, Mr. Williams underwent twice daily glucometer checks. The glucose levels during this 9-day period reflected achievement of glucose targets, likely reflecting that his remaining endogenous pancreatic function was stable with addition of exogenous insulin leading up to his arrival at Stateville Correctional Center. And for this brief period of time following his arrival, his pancreas was able to compensate without the exogenous insulin prescription. Medical experience predicts that this compensation could not last beyond a few weeks without medication intervention given Mr. Williams's long term insulin dependency.

12.     For unclear reasons, glucometer checks ceased altogether on 3/14/13 and were not checked again until 7/24/13 at which time his glucose level was found to be 423mg/dL. IDOC guidelines clearly state that "Persons with Type 2 diabetes must have access to blood glucose testing once per week or as otherwise clinically indicated." Ms. Schwarz's failure to comply with maintenance guidelines for monitoring Mr. Williams's diabetes is a clear departure from guidelines as well as common medial practice. Furthermore, she makes no reference to glucose testing in her 5/9/13 follow-up note where she states that Mr. Williams's records indicate he was never on insulin. Despite Mr. Williams's grievance which was filed and stated he requested to resume the diabetes medications which he had been on prior to arrival at Stateville, an additional 10 weeks passed before a glucose level was checked. By that time, he was in a glucose toxic state.

13.     On 5/9/13, Ms. Schwarz records that she "checked his chart" and determines there is no evidence that Mr. Williams was ever on insulin. If she had checked records from Stateville Correctional Center, she would have found a well-documented history that she herself prescribed insulin to Mr. Williams in April 2009. If she had checked any recent IDOC records, including Medication Administration records, she would have found clear documentation of insulin use, notably at Shawnee Correctional Center throughout 2012. Ms. Schwarz's statement that records do not reflect prior insulin use is blatantly false. Furthermore, the fact she doesn't believe his previous insulin use when she herself prescribed Mr. Williams insulin at Stateville during a previous incarceration proves that her medical insight and thoroughness are quite poor. The fact that Mr. Williams, on multiple occasions had to continue to claim previous insulin use and request resumption of insulin therapy, in the face of Ms. Schwarz's denial and refusal, represents medical negligence and deliberate indifference. Additionally, failure to prescribe Mr. Williams long-term insulin therapy placed him at risk for short-term and long-term complications of poorly controlled glucose regulation, ultimately increasing his risk of long-term organ damage.

14.    In patients with Type 2 diabetes, the standard of care is to measure blood sugars at routine intervals to assess the response to medication and other lifestyle changes. When blood sugars deviate from established goals, it is routine practice to adjust the patient's treatment plan. When medications are adjusted to improve a patient's blood sugar control, it is routine practice to monitor the response by evaluating the patient's subsequent blood sugar levels, especially when the adjustment involves a medication known to cause hypoglycemia.

15.    Glucose toxicity is defined as an average glucose > 250mg/dL or equivalent A1c > 10%. When a person is in a glucose toxic state, there are at very high risk for infection and microvascular damage to their eyes, kidney, and nerves. Management of glucose toxicity requires aggressive insulin therapy, including both basal (long-acting) and bolus (short-acting) insulin. Glucose levels should be monitored at least 4 times daily (premeal and bedtime) with frequent insulin adjustments made based on these readings until glucose levels achieve target goals. In addition to aggressive insulin therapy, all efforts should be made to provide a low glycemic diet, increase physical activity, and evaluate possible effects of glucose toxicity. People who are glucose toxic should undergo a dilated eye exam, be evaluated for sensory deficits in the extremities, and undergo a through skin exam to make sure there are no signs of infection.

16.    On 7/24/13, 4 months after his home insulin and Metformin were discontinued upon arrival to Stateville Correctional Center, glucometer testing during a medical visit revealed a glucose level > 300mg/dL three times, with the highest value recorded at 423mg/dL. Undeniably, Mr. Williams was in a state of glucose toxicity which required aggressive and comprehensive diabetes management. Ms. Schwarz started Mr. Williams on basal insulin in the form of NPH twice daily. Basal insulin only accounts for half of his insulin requirements at this time of glucose toxicity. Mr. Williams should have also been started on meal time (prandial) insulin, but he was not. Failure to prescribe prandial insulin placed Mr. Williams at risk for continued glucose toxicity and the negative outcomes associated with it. In addition to aggressive insulin therapy, Mr. Williams required a comprehensive glucose lowering plan which should have also included a low carbohydrate medical diet, diabetes education and self-management tools, screening for eye/kidney/nerve/cholesterol complications. Unfortunately for Mr. Williams, upon documenting three glucose levels greater than 300mg/dL, Ms. Schwarz did not write any orders for a medical diet, education, or evaluation of end organ complications. No referrals were made for specialty diabetes care. As a result, Mr. Williams remained glucose toxic for an additional 10 weeks and no medical progress notes were entered in the record from 7/24/13-10/9/13, despite average morning glucose levels of 240mg/dL and average evening glucose levels of 260mg/dL clearly recorded in the medical chart. The IDOC defines glucose targets of fasting 90-130mg/dL and peak post-prandial glucose level of 180mg/dL. Mr. Williams glucose levels remained markedly above these glucose targets for months and no change to his medical care was taken. Failure to intensify medical treatment during this prolonged period of glucose toxicity was medically reckless and placed Mr. Williams at severe risk of permanent end-organ damage and acute diabetic crisis/coma which carries a high risk of death.

17.    On 10/9/13, in the setting of worsening glucose toxicity, Ms. Schwarz changed Mr. Williams's insulin from basal only to a mixed insulin twice daily  Because mixed insulin 70/30 contains a combination of 70% long-acting and 30% short-acting insulin, it is required to be given prior to breakfast and prior to dinner. Given the pharmacokinetics of peak insulin

activity and duration of action, failure to administer mixed 70/30 insulin prior to these two mealtimes places a person at extremely high risk for hypoglycemia, defined as a blood sugar less than 70mg/dL. Hypoglycemia can lead to a variety of negative consequences, ranging from mild discomfort to death. For patients with Diabetes Mellitus, the American Diabetes Association establishes goal blood sugar levels that both ensure patient safety and aim to prevent long-term complications from diabetes. Symptoms and consequences of hypoglycemia include dizziness, weakness, sweating, personality changes, disorientation, seizure, loss of consciousness, and even death. As such, it is critical to limit hypoglycemia by understanding the pharmacokinetic profile of any insulin prescribed and timing insulin administration as to reduce the risk of hypoglycemia as much as possible.

18.     In Ms. Schwarz's medical note on 10/9/13, she wrote to discontinue NPH and start Novolin 70/30 24 units qAM and 12 units qPM. In her note, she does not specify that 70/30 insulin should be dosed prior to breakfast and dinner. In the Medical Administration Record (MAR), the 70/30 insulin was entered to be given as 24 units qAM and 12 units qHS (bedtime). Ms. Schwarz's order for 70/30 "qPM" failed to indicate that the evening dose needed to be administered prior to dinner. As such, the evening 70/30 dose was entered at bedtime which placed Mr. Williams at severe risk for harm. It is Ms. Schwarz's responsibility to verify that the insulin order she wrote is transcribed into the MAR appropriately. It is unclear if Ms. Schwarz ever checked the MAR order, or if she did, it is unclear that she recognizes that 70/30 insulin should never be given at bedtime. Either way, my opinion is that Ms. Schwarz acted medically irresponsibly in her poor medication ordering performance and her inability to recognize the recklessness of the error.

19.     On 10/17/13, Mary Diane Schwarz, P.A. documented a follow-up in the medical records. She wrote "glucometer stable" next to a glucose level documented as 235mg/dL. Yes, Mr. Williams's poor glycemic control was "stable" insofar as it remained unchanged. "Stable," however, should not be interpreted as a positive finding. Unchanged poor glycemic control should have prompted Ms. Schwarz to seek specialty care for her patient. Against IDOC guidelines that dictate consideration of referral for specialty care if 2 consecutive clinical visits reveal poor diabetes control, Ms. Schwarz made no such referral. IDOC guidelines further dictate, that if referral is deferred, alternative plan for action must be clearly documented in the medical record. On the contrary, there is no indication in this medical visit that any change in Mr. Williams's medical management was ordered. With her failure to appropriately manage or refer for specialty care, Ms. Schwarz continued to place Mr. Williams at severe risk of acute complications (infection, volume depletion) and permanent end organ damage (vision loss, kidney failure, neuropathy). Her continued reckless diabetes management can be summed up as medical malpractice as her failure to recognize and manage progressive glucose toxicity and its impact was so far below the medical standard of care. Her indifferent actions placed Mr. Williams at daily risk of harm without any evidence of value towards his well-being.

20.     According to guidelines set out by the ADA, IDOC, and Wexford, the intake examination should include a complete physical exam and laboratory evaluation. The reasoning for these guidelines is that Diabetes Mellitus is associated with multiple complications which can be mitigated if discovered early and if an aggressive treatment plan is started. The IDOC outlines that the intake exam should include vitals with attention to blood pressure and weight. There is instruction to record Body Mass Index (BMI) and a BMI chart is even provided. Mr.

Williams's intake exam did not include a calculation of BMI, and his elevated blood pressure of 139/83 was not mentioned or addressed by Ms. Schwarz. Fundoscopic exam performed by optometrist or ophthalmologist is dictated by ADA and IDOC guidelines, yet Ms. Schwarz did not refer Mr. Williams to Optometry until October 2013, seven months after she performed his initial intake evaluation. ADA and IDOC guidelines also dictate that the inmate undergo cardiac, skin, and a sensory exam. The neurovascular exam should include distal extremity pulses (which Ms. Schwarz documented as +2/2) and sensory (not documented). Laboratory studies to be drawn within the first two weeks of arrival should focus on assessing blood sugar control (Hemoglobin A1C) and evaluating comorbid conditions, including cholesterol and kidney function. Labs drawn on intake dated 3/4/13 do not include a Hemoglobin A1c, a lipid panel, or a urine microalbumin/creatinine ratio as dictated by professional guidelines and standard medical practice. In fact, against clear guidelines, throughout his entire incarceration at Stateville Correctional Center, Mr. Williams never underwent measurement of his cholesterol or urine microalbumin levels. Based on complete review of the medical record, Ms. Schwarz was Mr. Williams's primary medical provider from March through October 2013. The responsibility to order labs that could detect early development of end organ damage and cardiovascular risk factors fell on her. She did not uphold her medical responsibility and as such placed Mr. Williams at risk of diabetes complications she could have and should have been monitoring. In the year 2013, to not check a Hemoglobin A1c, lipid panel, and urine microalbumin on a person with Diabetes Mellitus is not only against IDOC and ADA guidelines, but also against the minimal medical care that a medical provider should know to provide.

21. Diabetes is associated with a high risk of cardiovascular disease, the severity of which is worsened when the patient also has high cholesterol. Therefore, controlling cholesterol, especially LDL (bad cholesterol), is critical to lowering the risk of cardiovascular disease in patients with diabetes. As such, the standard of care is to order labs to assess cholesterol levels at least annually in patients with diabetes. For patients with diabetes, the standard of care is to maintain an LDL cholesterol level at least less than 100. During his incarceration at Stateville Correctional Center, Mr. Williams never underwent cholesterol testing. Failure to check Mr. Williams's cholesterol placed him at risk of future cardiovascular disease, including the increased risk of heart attack, stroke, and/or death.

22. Additional cardiovascular risk can be assessed by monitoring and treating elevated blood pressure. In 2013, IDOC and ADA guidelines dictated that BP be maintained < 130/80. Wexford guidelines recommended initiating a low dose ACE Inhibitor unless contraindicated. Mr. Williams had a history of hypertension prior to his arrival at Stateville Correctional Center in 2013. In fact, medical records from 2012 clearly indicate that his hypertension was medically managed with an ACE Inhibitor (Enalapril) and a Beta Blocker (Atenolol). Two days prior to his arrival at Stateville, Mr. Williams underwent a medical evaluation at Cermack Health Services on 3/2/13 which documented Hypertension in his medical problem list. The medical history during this exam documented that Mr. Williams used Enalapril 20mg daily for management of his hypertension.

23. On arrival to Stateville on 3/4/13, Mr. Williams's first exam revealed that his blood pressure was above goal, yet no mention was made to his elevated blood pressure or plan for management. For unclear reasons, Ms. Schwarz chose not to continue his ACE Inhibitor. Despite multiple recordings of elevated blood pressure during his incarceration at Stateville, an

ACE inhibitor was not prescribed until October 2013, seven months after his arrival. Failure to recognize and managed Mr. Williams's elevated blood pressure directly contributes to eye and kidney damage in addition to increasing his risk of heart disease and stroke. There is no medical justification for ignoring the importance of managing Mr. Williams's hypertension and failing to continue his ACE Inhibitor given no evidence of contraindication.

24. Eye disease is a known complication of diabetes. One such common eye disease is diabetic retinopathy, which is an abnormal growth of blood vessels in the retina and is the leading cause of blindness in people with diabetes. As such, the standard of care when treating all patients with diabetes is to order an annual dilated eye examination to be performed by a licensed eye care professional. Early detection of eye disease in patients with diabetes is critical to identify ways to reverse or slow the progression of eye disease. In addition, timely treatment of eye disease can prevent permanent vision loss.

25. Prior to his arrival to Stateville in 2013, Mr. Williams's medical records from various IDOC facilities document normal dilated eye exams. On 5/24/11, 18 years after his diagnosis with Diabetes Mellitus, Mr. Williams's dilated eye exam reported no evidence of diabetic retinopathy. Despite clear guidelines set forth by IDOC and the ADA, and months of severe glucose toxicity, Mr. Williams was not referred to Optometry until seven months after his arrival to Stateville. The medical records I reviewed do not show that Mr. Williams in fact underwent a dilated eye exam while at Stateville Correctional Center in 2013. Two months after leaving Stateville, on 2/3/14, Mr. Williams complained of difficulty reading and problems with vision in his right eye. On 3/18/14, Mr. Williams underwent an Optometric Exam and was diagnosed with retinopathy and macular changes in the right eye. In April 2014, Mr. Williams undergoes ophthalmologist evaluation by a retinal specialist and is found to have diabetic macular edema (right eye) with a background of diabetic retinopathy (both eyes) which required both steroid injection ad laser therapy to the right eye. Unfortunately, despite treatment by a retinal specialist in 2014, Mr. Williams's vision continued to decline. Poor glucose and blood pressure control while under Ms. Schwarz's care from March 2013 through October 2013 certainly would have contributed to the new onset of diabetic retinopathy as discovered in 2014. Failure to refer for a dilated eye exam sooner, prevented early detection and intervention. Given the timeline of events, Mr. Williams's now suffers from the permanent retinal damage undoubtedly due to poor glycemic control under Ms. Schwarz's care.

26. People with diabetes are at increased risk of problems related to their feet, including neuropathy, which causes decreased sensation, and vascular disease, which causes decreased blood flow to the feet. These conditions increase the risk of foot infection and trauma in people with diabetes. As such, the standard of care while treating all patients with diabetes is to perform or order by referral a comprehensive foot examination, which should include testing of sensation and foot pulses, at least annually.

27. Prior to his arrival at Stateville Correctional Center in March 2013, Mr. Williams has a documented history of neuropathy for which he was taking Neurontin at previous IDOC facilities. This history was also documented in the Cermack Health Services exam performed two days prior to his arrival at Stateville. The clinical intake history recorded by C smith, R.N. on 3/4/13 lists Gabapentin 300mg every 8 hours on his medication profile. Despite this history, Mary Diane Schwarz, P.A. did not document a lower extremity monofilament or sensory

examination during his intake physical exam. In addition, she failed to continue his chronic medication to manage neuropathy pain. Ms. Schwarz's failure to review Mr. Williams's medical history regarding his neuropathy, failure to perform a foot sensory exam, and failure to continue his chronic neuropathy medication reflects medical negligence. In addition, Ms. Schwarz failed to comply with IDOC guidelines which states that "patients with neuropathy and/or foot ulcers require careful visual, sensory, and pulse assessment of feet every visit plus education regarding foot care." Given a history of neurologic sensory deficit, measures should have been taken to protect against tissue trauma of the feet. Standard measures would have included diabetic shoes and podiatric referral, neither of which took place under Mary Diane Schwarz's care.

28. On 3/4/13, Mr. Williams's underwent his intake exam at Stateville, performed by Mary Diane Schwarz, P.A. She recorded normal peripheral pulses as +2/2. However, examination on 10/9/13 recorded peripheral pulses as +1/2. This change in reduced palpable peripheral pulses should have prompted further investigation for detection of peripheral vascular disease. Guidelines dictate that additional testing with Ankle Brachial Index calculation would have been an appropriate next step given an abnormal peripheral pulse detection. Failure to investigate the etiology of Mr. Williams's abnormal peripheral pulses placed Mr. Williams at risk for further peripheral vascular disease complications with possible negative outcomes of claudication, gangrene, and amputation.

29. People with Diabetes Mellitus are at increased risk of skin infections. The risk is multifactorial given poor tissue perfusion, poor wound healing, and heightened bacterial and fungal growth in a high glycemic environment. Recurrent fungal infections, such as the tinea cruris afflicting Mr. Williams is often a reflection of poor glycemic management. Multiple physical exams continued to report persistent tinea infections for which Mr. Williams was prescribed topical antifungal creams. However, Mr. Williams continued to report that the topical medications were not effective in eradicating his persistent fungal infections. Ms. Schwarz should have recognized that Mr. Williams's poor glycemic control was contributing to his persistent fungal infections. She never made documented reference connecting his persistent fungal infections and his poor glycemic control. Failure to properly manage Mr. Williams's hyperglycemia was likely a significant contributor to his persistent fungal infections which caused Mr. Williams marked physical and emotional distress.

30. From July through October 2013, Mr. Williams was experiencing severe glucose toxicity with glucose levels above goal almost every day. Ms. Schwarz's last documented note in the medical record on 10/17/13 reveals that despite persistent A1c above 9% and a glucose level of 235mg/dL at the time of exam, no changes were made to his diabetes management plan. On 10/25/16, Mr. Williams morning glucose level was 332mg/dL. The following day, on 10/26/13, Mr. Williams complained of acute onset throat swelling and a painful right submandibular lump. Within a day, he was febrile with reports of pus emanating from his neck and mouth. Mr. Williams was diagnosed with cellulitis and requiring treatment with intravenous antibiotics. Mr. Williams's persistent glucose toxic environment likely contributed to this acute bacterial infection. Surprisingly, throughout his entire two-week infirmary admission, there is no mention of hyperglycemia or effort made to aggressively manage Mr. Williams's diabetes to assist with infection healing. While it is unclear what the Stateville policy is for transferring care from Mr. Williams's primary medical provider once transfer to the infirmary was made, there is no evidence that Ms. Schwarz, Mr. Williams's primary medical practitioner since his arrival to

Stateville, made any effort to communicate or mitigate the severity of Mr. Williams's hyperglycemia. In my medical opinion, failure to aggressively manage hyperglycemia likely contributed to the morbidity of his cellulitis infection.

## CONCLUSION

In summary, upon detailed review of Mr. William Williams's medical records, focusing on his time while incarcerated at Stateville Correctional Center from March 2013 through November 2013, it is clear that Mr. Williams's medical care at Stateville was significantly below the standard of care for an individual with longstanding Diabetes Mellitus and Hypertension. Mr. Williams reports that the severe hyperglycemia experienced through the majority of his incarceration at Stateville Correctional Center caused his tremendous physical harm as well as grave emotional distress. The physician assistant Mary Diane Schwarz was Mr. Williams's primary medical practitioner during his incarceration at Stateville, and as such, it was her responsibility to attain, maintain, and monitor adequate diabetes and hypertensive management. The paucity of care, dismissal of Mr. Williams's request to resume his chronic and essential medications, and reckless disregard for urgency in the face of worsening glucose toxicity, proves that Ms. Schwarz's actions were far below the medical standard of care, equated to medical negligence, and often reflected her deliberate indifference towards Mr. Williams. Given her clear inadequacy to care for Mr. Williams's escalating glucose toxicity, her failure to refer for specialty care contributed to Mr. Williams's development of retinopathy, acute infections, worsening neuropathy, and other immeasurable microvascular damage. Furthermore, Ms. Schwarz's distrust and dismissiveness of Mr. Williams's self-advocacy highlights her medical incompetence in providing Mr. Williams adequate care.

Caring for a person with Diabetes Mellitus requires diligent, comprehensive, and insightful medical experience in diabetes management. Mr. Williams deserved better medical diabetes care than he was provided at Stateville under Ms. Schwarz's duty. As a direct and indirect result of the substandard medical care he received at Stateville Correctional Center, Mr. Williams has suffered both physical and emotional harm as described in detail throughout my report.

I am being compensated at a rate of $350/hour for my study of this matter and $500/hour for deposition or trial testimony.

I reserve the right to revise my report as new information becomes available through discovery of additional documents and subsequent depositions.

Sincerely,

Marla Barkoff

Marla S. Barkoff, M.D.

# Marla S. Barkoff, M.D.
## Curriculum Vitae

**Home Address**
1137 W. Wrightwood Ave. #2
Chicago, IL 60614
Tel: (773) 885-0558
Email: marlabarkoff@gmail.com

**Work Address**
Integrative Endocrinology
233 E. Erie Street, Suite 800
Chicago, IL 60657
Phone: (773) 273-7022

## Employment

### Current Position
December, 2016 – present

Integrative Endocrinology, LLC
    Founder/Endocrinologist
    Specializing in Autoimmune Thyroid Disease and thyroid disease
    in pregnancy.  Investigating the association between Autoimmune
    Thyroid Disease and Mast Cell Disorders.

### Former Position
February, 2014 – December 2016

University of Illinois at Chicago
    Division of Endocrinology, Diabetes, and Metabolism
    Assistant Professor of Clinical Medicine
    Assistant Program Director, Endocrinology Fellowship

November, 2009 – January, 2014

Mount Sinai Hospital
    Division of Endocrinology, Diabetes, and Metabolism
    Site Director, Internal Medicine Clerkship and Sub-Internship
    Founder, Osteoporosis Clinic and Save the Bone Program
    Endocrine Consultant, Touhy Health Center Refugee Clinic
Rosalind Franklin University of Medicine and Science
    Clinical Assistant Professor of Medicine

## Education

### Fellowship Education
July, 2007 – August, 2009

The University of Chicago
Section of Endocrinology, Diabetes, and Metabolism
Chicago, Illinois

### Residency Education
June, 2004 – June, 2007

Brown Medical School
Internal Medicine, Rhode Island Hospital/The Miriam Hospital
Providence, Rhode Island

### Medical Education
September, 2000 – May, 2004

Boston University School of Medicine
Boston, Massachusetts
M.D. Degree May, 2004

### Undergraduate Education
September, 1994 – May, 1998

University of Pennsylvania
Anthropology, concentration in Physical Anthropology
B.A. Degree May, 1998, *cum laude*, Dean's List 9/1997 – 5/1998
Philadelphia, Pennsylvania

Marla S. Barkoff, M.D.

August, 1996 – December, 1996          School for International Training
                                       Zanzibar, Tanzania, East Africa
                                       Thesis. Foraging Patterns of the Zanzibar Red Colobus Monkey

**Publications**

Kramer O, Barkoff MS, Hernandez C. Mast Cell Activation Syndrome. Skinmed manuscript #10102; accepted for publication September 2016.

Cueva S, McQueen D, Barkoff MS, Stephenson M. Are maternal thyroid antibodies associated with euploid miscarriage in women with recurrent pregnancy loss (RPL)? Fertil Steril 2016;105:e341.

Sriphrapradang C, Tenenbaum-Rakover Y, Weiss M, Barkoff MS, Admoni O, Kawthar D, Caltabiano G, Pardo L, Dumitrescu AM, Refetoff S. The coexistence of a novel inactivating mutant thyrotropin receptor allele with two thyroid peroxidase mutations: a genotype-phenotype correlation. J Clin Endocrin Metab. 2011;96.E1001-6

Barkoff MS, Kocherginsky M, Anselmo J, Weiss RE, Refetoff S. Autoimmunity in patients with resistance to thyroid hormone J Clin Endocrin Metab. 2010;95:3189-93.

Tenenbaum-Rakover Y, Grasberger H, Mamanasiri S, Ringkananont U, Montanelli L, Barkoff MS, Dahood AM-H, Refetoff S. Loss-of-Function Mutations in the Thyrotropin Receptor Gene as a Major Determinant of Hyperthyrotropinemia in a Consanguineous Community. J Clin Endocrin Metab 2009;94:1706-12.

Barkoff MS, Kocherginsky M, Weiss RE, Refetoff S Resistance to Thyroid Hormone (RTH) and Autoimmune Thyroid Disease (AITD): a possible causal relationship. Thyroid 2009;19:91-2.

**Grant Funding**

January, 2015 – December 2016         The University of Illinois at Chicago, Department of Medicine
                                      Innovative Funding Program, Grant Code 200250-586015-586282

**Research Experience**

December, 2016 – present              Autoimmune Thyroid Disease and Mast Cell Disorders
                                      Investigating the incidence of Mast Cell Disorders in people with
                                      Hashimoto's Thyroiditis and Graves' Disease. Correlating Thyroid
                                      Quality of Life scores (ThyPRO39) and mast cell mediator levels.

June, 2014 – December, 2016          Thyroid Disease and Pregnancy
                                      Mentors: Alex Stagnaro-Green, M.D and Mary Stephenson, M.D.
                                      Investigation of the association between thyroid autoimmunity and
                                      pregnancy outcomes in women with infertility and recurrent pregnancy
                                      loss. Additional focus on racial and ethnic differences in thyroid function
                                      and autoimmunity in women with infertility.
                                      University of Illinois at Chicago, Chicago, IL

July, 2007 – August, 2009            Thyroid Study Unit
                                      Mentor: Samuel Refetoff, M.D.
                                      Genetic evaluation of Resistance to Thyroid Hormone and Resistance to
                                      Thyrotropin. Investigation of the relationship between Resistance to
                                      Thyroid Hormone and Autoimmune Thyroid Disease.
                                      The University of Chicago, Chicago, IL

January, 2007 – February, 2007       Biological Impact Assessment of Salt Iodization in Northern Ghana
                                      Sentinel Zone Survey; collaboration between UNICEF Ghana, The
                                      University of Ghana, and Ghana Health Service
                                      Jirapa, Ghana, West Africa

Marla S. Barkoff, M.D.

| | |
|---|---|
| August, 2005 – June, 2007 | The Role of Low-Iodine Diet Adherence Prior to $^{131}$I Ablation in Thyroid Cancer Patients Postthyroidectomy<br>Retrospective Chart Review<br>Research Advisor: James V. Hennessey, M.D.<br>Department of Endocrinology, Brown Medical School, Providence, RI |
| October, 1998 – April, 2000 | The Development of Hepatocellular Carcinoma in Senegalese Men Infected with the Hepatitis B Virus<br>Prospective Cohort Study<br>Research Advisor: W. Thomas London, M.D.<br>Collaboration between Fox Chase Cancer Center, Philadelphia, PA and Army Health Services, Dakar, Senegal, West Africa |

**Teaching Experience**

| | |
|---|---|
| February, 2014 – present | Endocrinology Fellowship and Internal Medicine Residency Lecture Series<br>Medical Student and Pharmacy Student Pathophysiology Lecture Series<br>University of Illinois at Chicago |
| January, 2011 – January, 2014 | Site Director<br>Mount Sinai Hospital, Internal Medicine Clerkship and Sub-Internship<br>Academic coordinator, educator, and mentor for 3rd and 4th year medical students rotating through the Department of Medicine |
| November, 2009 – January, 2014 | Residency Lecture Series<br>Mount Sinai Hospital and Schwab Rehabilitation Hospital<br>Monthly lectures to residents in the Departments of Medicine, Family Medicine, and Physical Medicine and Rehabilitation |
| Winter 2008; Winter 2009 | Preceptor<br>The University of Chicago Pritzker School of Medicine, Med Biology 307<br>Clinical Pathophysiology and Therapeutics, Endocrine Section |
| July, 2005 – June, 2007 | Supervising Resident<br>Brown Medical School, Biomed 301, Core Clerkship in Internal Medicine<br>Brown Medical School, Biomed 333, Acting Internship in Internal Medicine |

**Lectures**

| | |
|---|---|
| October, 2016 | "Mast Cell Disorders: Case Reports Referred from the Reproductive Endocrinology Clinic"<br>Department of OB/GYN, Division of Reproductive Endocrinology, UIC |
| February, 2016 | "Thyroid Nodules: Clinical Update in Evaluation and Management"<br>Department of Medicine, Internal Medicine Resident Lecture, UIC |
| February, 2015, annually | "The Pathophysiology of Thyroid Disease"<br>Clinical Pathophysiology Course, University of Illinois at Chicago |
| January, 2015 | "Thyroid Function Tests: Interpretation of Assays and Results"<br>Department of OB/GYN, Division of Maternal Fetal Medicine, UIC |
| December, 2014 | "Thyroid & Reproductive Health: The Importance of Preconception Management in Women with Thyroid Disease"<br>Department of Medicine Grand Rounds, University of Illinois at Chicago |
| November, 2014, annually | "Thyroid Disorders: Understanding Thyrotoxicosis and Hypothyroidism"<br>Department of Medicine, Internal Medicine Resident Lecture, UIC |

Marla S. Barkoff, M.D.

| | |
|---|---|
| October, 2014 | "Thyroid Disease & Pregnancy: An Endocrinologist's Approach" Department of OB/GYN Grand Rounds, University of Illinois at Chicago |
| March, 2014, annually | "Portrait of the Pituitary" College of Pharmacy, University of Illinois at Chicago |
| February, 2013 | "Evaluation & Management of Thyroid Nodules. An Endocrinologist's Approach" Department of Surgery Grand Rounds, Mount Sinai Hospital |
| April, 2012 | "Thyroid Nodules. Clinical Update for 2012" Department of Medicine Grand Rounds, Mount Sinai Hospital |
| April, 2011 | "Titrating Insulin: A Nurse's Guide to Titrating Insulin" Nursing Education Series, Lawndale Christian Health Center |
| March, 2011 | "Thyroid Dysfunction: Clinical Management in Surgical Patients" Department of Surgery Grand Rounds, Mount Sinai Hospital |
| October, 2010 | "Thyroid Nodules: Clinical Update in Evaluation and Management" Department of Medicine Grand Rounds, Mount Sinai Hospital |
| June, 2010 | "Insulin Therapy in the Management of Diabetes Mellitus" Continuing Medical Education, Lawndale Christian Health Center |
| April, 2010 | "Signs and Symptoms of Type 2 Diabetes Mellitus" Diabetes Block Captains Education Series, Sinai Urban Health Institute |
| February, 2010 | "Osteoporosis: Update in Clinical Management" Department of Medicine Grand Rounds, Mount Sinai Hospital |
| March & November 2008, March 2009 | "Endocrine Emergencies" Critical Care Nursing Education Series, The University of Chicago |

## Honors & Awards

| | |
|---|---|
| February, 2016 | UI Care Award, Honored by UI Hospital and clinical leadership |
| 2015 - 2016 | Castle Connolly "Top Doctors 2015", "Top Doctors 2016" |
| June, 2007 | Graduating Resident Award: Best Patient Advocate Internal Medicine Residency, Brown Medical School |
| August, 2003 | Best Standardized Patient Clinical Evaluation Family Medicine Clerkship, Boston University School of Medicine |

## Committees

| | |
|---|---|
| 2015 – present | Task Force on Thyroid Disease and Pregnancy, ATA |
| 2011 – 2014 | NextGen (EMR) Physician Council, Mount Sinai Hospital |
| 2011 – 2014 | Physician Wellness Committee, Mount Sinai Hospital |
| July, 2004 – June, 2007 | Accreditation Council Graduate Medical Education, Brown Med School |

## Examination & Licensure

| | |
|---|---|
| October, 2009 | ABIM, Endocrinology, Diabetes, and Metabolism |
| August, 2007 | ABIM, Internal Medicine |
| June, 2002; September, 2003; April 2006 | National Board of Medical Examiners, USMLE Step I, II, III |

Marla S. Barkoff, M.D.

**Professional Societies**
2015 – present          The Mastocytosis Society
2010 – present          National Osteoporosis Foundation
2007 – present          The Endocrine Society
2007 – present          American Thyroid Association, Task Force Thyroid Disease & Pregnancy
2005 – present          International Council for Control of Iodine Deficiency Disorders

**Volunteer Activities**
January, 2007 – February, 2007          UNICEF Ghana and ICCIDD Volunteer
                                        Collaborated on a biologic impact assessment of salt iodization in Ghana.
                                        Selected sentinel zone survey participants, created household
                                        questionnaires, trained survey personnel, and supervised data collection.

September, 2005 – June, 2007          Rhode Island Medical Reserve Corps
                                      Performed physical examinations and coordinated medical care of
                                      evacuees relocated to Rhode Island following Hurricane Katrina.

**Medical Expert Testimony**
Deposition testimony, 2016          Byron E. Adams v Richard Harrington et al, 14-366-NJR-DGW

Deposition testimony, 2015          Byron E. Adams v. S. Cullinan, M.D., 12-cv-50297, United States
                                    District Court for the Northern District of Illinois, Western
                                    Division.

**Hobbies/Interests**
Proficient in French and Swahili; served as a Swahili translator during the Atlanta Summer Olympic Games
Avid hiker with a summit reach of Mt. Kilimanjaro and trek through the Himalayas
Extensive travel throughout Africa, Asia, and the Middle East
Instructor of Letter Sounds and Sight Words, Mayer Magnet School, Chicago, IL
Raising my children to demonstrate kindness, make healthy choices, and explore the world

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION UNDER § 1983 |
| | ) | |
| vs. | ) | Case No. 1:15-CV-01691 |
| | ) | |
| MARY DIANE SCHWARZ, P.A. | ) | Hon. Sheila Finnegan |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

**ATTORNEY AFFIDAVIT**

I, Giel Stein, the undersigned attorney, hereby state as follows:

1.     I am licensed to practice law in the States of Illinois.

2.     On July 23, 2015, the Court appointed my colleague Royal Martin to represent plaintiff William Williams ("Williams") in the above-captioned action. At Mr. Martin's request, I am serving as his co-counsel in this matter.

3.     Counsel for Williams conducted discovery to gain insight into Williams's claims.

4.     As required by 735 ILCS 5/2-622, I consulted and reviewed the facts of this case with Marla Barkoff, M.D., an endocrinologist licensed to practice medicine in the State of Illinois. Dr. Barkoff reviewed Williams's medical records produced in response to our discovery requests. She also studied the transcripts of depositions taken in this case and consulted various other materials itemized in her report to assist in the formation of her opinions.

5.     I reasonably believe that Dr. Barkoff is knowledgeable in the relevant issues involved in this case. *See* 735 ILCS 5/2-622(A)(1)(i). Additionally, Dr. Barkoff has practiced medicine within the last six years, is qualified by her years of experience, and has demonstrated competence in the subject matter of this case. *Id.* at 5/2-622(A)(1)(ii)-(iii).

1

6.    Dr. Barkoff has determined in a written report that there is a reasonable and meritorious cause for filing a medical malpractice claim against Defendant Mary Diane Schwarz, P.A. Dr. Barkoff's report is attached to Williams's Second Amended Complaint as Exhibit 1.

7.    Based on Dr. Barkoff's review and consultation, I have concluded that there is a reasonable and meritorious cause for filing a medical malpractice claim against Schwarz.

I certify under penalty of perjury that the foregoing is true and correct.

Dated:  April 11, 2017

_____
Giel Stein

Giel Stein (6275990)
CLARK HILL PLC
130 E. Randolph Street
Suite 3900
Chicago, IL 60601
T: (312) 985-5900
F: (312) 985-5979
gstein@clarkhill.com

SUBSCRIBED AND SWORN TO BEFORE ME
this 11th day of April, 2017

_____
Notary Public

OFFICIAL SEAL
Roberta Bauer
Notary Public, State of Illinois
My Commission Expires 1/27/18

2

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that he caused a copy of the attached SECOND AMENDED COMPLAINT to be served on April 25, 2017, on counsel of record using the Court's electronic case filing system.

Dated:  April 25, 2017

Respectfully submitted,

By:     */s/ Giel Stein*

Giel Stein (6275990) gstein@clarkhill.com
CLARK HILL PLC
130 E. Randolph Street
Suite 3900
Chicago, IL 60601
T: (312) 985-5900
F: (312) 985-5979