**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 15 C 1691** |
| | ) | |
| **MARY DIANE SCHWARZ, P.A.,** | ) | **Magistrate Judge Finnegan** |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff William Williams filed this lawsuit under 42 U.S.C. § 1983 alleging that Defendant Mary Diane Schwarz, P.A., was deliberately indifferent to his type 2 diabetes mellitus while he was a pretrial detainee at the Stateville Northern Reception Classification Center ("NRC"). Plaintiff also asserts state law claims for medical malpractice, negligent infliction of emotional distress, and intentional infliction of emotional distress. Currently before the Court is Defendant's motion for summary judgment on the deliberate indifference and infliction of emotional distress claims. Defendant argues that Plaintiff cannot establish that the treatment she provided him was blatantly inappropriate given that her two retained medical experts have both opined that she at all times complied with the applicable standard of care. Defendant further contends that Plaintiff cannot satisfy the elements of his infliction of emotional distress claims, including that he actually suffered severe emotional distress as a result of Defendant's actions.

After careful review of the record, the Court concludes that when the facts are construed in the light most favorable to Plaintiff, a genuine issue of material fact exists

that forecloses summary judgment in Defendant's favor at this stage of the case. Defendant's motion for summary judgment is therefore denied.

**BACKGROUND**[1]

When considering Defendant's summary judgment motion, the facts are viewed in a light most favorable to Plaintiff. *Continental Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Though the Court must assume the truth of those facts for purposes of this motion, it does not vouch for them. *Arroyo v. Volvo Group N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

**A.    Treatment from April 2009 through November 2012**

Plaintiff has a history of type 2 diabetes dating back to 1993 and has spent much of his adult life either incarcerated or homeless. (Doc. 132 ¶ 9; Doc. 123-1, at 4-5, Williams Dep., at 15-18). He first encountered Defendant, a licensed physician's assistant employed by Wexford Health Sources, Inc. to provide medical care at the NRC, on April 3, 2009. At that time, Defendant conducted an Offender Physical Examination and, based on Plaintiff's average glucometer reading of 280 (the target range is between 120 and 180), switched him from the Metformin he had been taking to Novolin 70/30 insulin 28 units in the morning and 12 units in the evening.[2] (Doc. 130-1, at 5; Doc. 134 ¶ 7; Doc. 123-11, at 8, Molitch Dep., at 169).

---

[1]     The following facts are drawn from Defendant's Revised Rule 56.1 Statement of Material Facts (Doc. 123), Plaintiff's Response to Defendant's Rule 56.1 Statement of Material Facts (Doc. 132), Plaintiff's Statement of Additional Facts (Doc. 130), Defendant's Response to Plaintiff's Statement of Additional Facts (Doc. 134), and exhibits submitted by the parties in support of their factual statements. Unless otherwise specified, page numbers for all record citations are drawn from the CM/ECF docket entries at the top of the filed document. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

[2]     Metformin and Novolin 70/30 are both used to control high blood sugar. Metformin is an oral medication, whereas Novolin 70/30, "a mixture of 70% intermediate-acting insulin . . . and

Since the NRC serves as an intake for all the prison facilities in northern Illinois, most inmates can expect to stay there for 30 days or less before being transferred to a longer stay housing facility. (Doc. 132 ¶ 23). Consistent with that usual protocol, Plaintiff was transferred to Shawnee Correctional Center on April 14, 2009, where he continued to be prescribed mixed insulin 70/30 and other diabetes care through September 2011. There were, however, numerous occasions when he refused treatment. (Doc. 130 ¶ 5; Doc. 134 ¶ 5; Doc. 130-2, at 2-66). Neither party has provided medical records from September 2011 to March 2012 so it is unclear what diabetes treatment Plaintiff was receiving during that period, if any. When Plaintiff was released in November 2012, his medication administration records showed that he had been prescribed insulin 70/30 65 units in the afternoon from March 8 to May 8, 2012, at which time the dosage was increased to 75 units in the afternoon. (Doc. 130-1, at 11-24).

**B.     Treatment in March 2013**

Plaintiff was living on the streets from November 2012 until March 2, 2013, when he entered the Cook County Jail. He told Dr. Terrance Baker of Cermak Health Services that he had been taking Metformin and 70/30 insulin 7 units in the morning and 15 units in the evening, and that his last insulin dose was "yesterday morning." (Doc. 130 ¶ 6; Doc. 132 ¶ 16; Doc. 123-1, at 4, Williams Dep., at 15-16). Dr. Baker was "not convinced" that Plaintiff needed insulin and so ordered Metformin and twice-daily blood glucose checks ("Accu-Cheks") to assess his blood sugar levels. (Doc. 132 ¶ 19; Doc. 134 ¶¶ 6, 8). He also prescribed tramadol and gabapentin for pain, and enalapril for high blood pressure. (Doc. 130 ¶ 8; Doc. 130-4, at 9). On the morning of March 4, 2013, Plaintiff

---

30% short-acting insulin," is administered by injection. (https://www.webmed.com/drugs/2/drug-1468/novolin-70-30-u-100-insulin-subcutaneous/details, last visited March 22, 2018).

did not present for diabetic medication or an Accu-Chek.  Later that day he was transferred to the NRC, where he would remain until November 2013.  (Doc. 132 ¶¶ 21, 22).

During a health screening evaluation at the NRC with C. Smith, R.N., Plaintiff again stated that he had been taking Metformin and 70/30 insulin 7 units in the morning and 15 units in the evening.  (*Id.* ¶¶ 22, 24).  Defendant examined Plaintiff at 4:00 p.m. and noted that according to the Cook County Jail pharmacy sheet, he was not on insulin.  She documented that Plaintiff nonetheless "WANTS INSULIN??," written in all-caps to indicate that he was being aggressive in his demand.  (*Id.* ¶¶ 26, 29).  At the same time, Defendant recorded that Plaintiff had a 20-year history of type 2 diabetes, and she remembered having prescribed him insulin in April 2009 because he was on "major, major amounts" of oral medication.  (Doc. 130 ¶ 9; Doc. 134 ¶ 9).  Plaintiff did not raise any complaints regarding his eyes, feet, fingers, or hands during that initial evaluation, and Defendant decided not to order any of the medications listed on the Cook County Jail pharmacy sheet.  Instead, she ordered twice-daily Accu-Cheks (with no stop date) and instructed Plaintiff to follow up with her on March 5 or 6.  (Doc. 132 ¶¶ 25-27; Doc. 130 ¶ 9; Doc. 134 ¶ 9).

Between March 5 and 13, 2013, Plaintiff's blood sugar was checked twice daily. His results were generally within the target range, though one of his afternoon readings was slightly elevated at 193.  (Doc. 132 ¶ 34; Doc. 134 ¶ 10; Doc. 130-1, at 65).  When Plaintiff saw Defendant again on March 8, 2013 for a follow-up on his type 2 diabetes, his glucometer reading was 158 without medication and Defendant again decided not to prescribe him insulin or any other diabetes-related treatment.  She did, however,

prescribe a fungal cream to treat a rash. (Doc. 134 ¶ 11; Doc. 132 ¶¶ 32, 33; Doc. 123-2, at 139). The parties agree that after March 13, 2013, Plaintiff stopped getting his daily Accu-Cheks, though they dispute the reason for the discontinuation. Defendant says that Plaintiff refused the tests on the afternoon of March 13 and the morning of March 14, at which point the checks ceased. Plaintiff denies that he refused any Accu-Cheks and claims he made repeated requests for medical care that went unanswered. (Doc. 132 ¶ 35; Doc. 130 ¶ 16). Regardless, it is undisputed that Plaintiff did not receive further treatment until May 2013.

### C.    Treatment in May 2013

On May 7, 2013, Plaintiff filed a grievance requesting medical attention for his diabetes. He stated that he was experiencing symptoms of hypoglycemia several nights a week, and expressed concern that his life was in "jeopardy." (Doc. 130 ¶ 12; Doc. 130-1, at 27-28). Two days later, on May 9, 2013, Plaintiff started experiencing back pain on his way to a court appearance. Defendant examined Plaintiff, gave him a single dose of tramadol, and asked him to follow up as necessary. (Doc. 132 ¶¶ 38, 39). Plaintiff says he told Defendant he was diabetic, explained that he had been at the NRC since March, and asked about receiving insulin and Accu-Cheks. (Doc. 123-1, at 21-22, Williams Dep., at 84-85). Defendant claims that Plaintiff never mentioned any concerns about diabetes or hypoglycemia during that visit, but her treatment note states "I didn't believe he was on insulin. I told him no insulin [illegible] his records. His records confirm he was never on insulin." (*Id.* at 38; Doc. 134 ¶ 14; Doc. 130-1, at 33).

A prison official denied Plaintiff's grievance on May 23, 2013, and he filed a second one on June 8, 2013, again seeking medical care for his diabetes and expressing concern

that his life was in "jeopardy." (Doc. 130 ¶ 15; Doc. 123-1, at 96-97; Doc. 130-1, at 27).

Defendant denies having any knowledge of either the May or June grievances. (Doc. 134

¶¶ 12, 15; Doc. 123-2, at 54, Schwarz Dep., at 207).

###### D. Treatment from July through October 17, 2013

Plaintiff next received treatment on July 24, 2013, when Defendant examined him

and administered an Accu-Chek (the first one documented since March 14, 2013). One

reading showed his blood glucose level was 426, and two subsequent readings measured

it at 300. (Doc. 134 ¶ 17; Doc. 132 ¶ 40). Defendant indicated that Plaintiff had "no insulin

on streets secondary to homeless; lost to follow-up, no complaints to anyone." (Doc. 132

¶ 40). She also claimed that Plaintiff had been "vague about his diabetic insulin" with no

evidence of "weight loss, polydipsia, glucose leakage, protein, etc." (Doc. 134 ¶ 18; Doc.

130-1, at 33). Defendant administered insulin and issued a prescription for an

intermediate-acting insulin ("NPH" insulin) that continued for the next few months.

Defendant claims she also planned to add 10 units of regular insulin and twice-daily Accu-

Cheks if needed, but it does not appear she documented that in her notes. After receiving

the first dose of insulin, Plaintiff's blood glucose level dropped to 195. (Doc. 132 ¶ 41;

Doc. 130-1, at 33). Over the next three months, Plaintiff's blood glucose levels ranged

from 123 to 350 in the mornings (with the average being 223), and 114 to 216 in the

evenings (with the average being 164). (Doc. 134 ¶ 20).

There is no documentation showing that Plaintiff was referred back to Defendant

for diabetes concerns from July 24 to October 9, 2013. (Doc. 132 ¶ 43). On October 9,

2013, he saw Defendant due to increasing glucometer scores noted by staff members

performing his Accu-Cheks. Defendant prescribed Novolin 70/30 24 units in the morning

and 12 units in the afternoon. She also ordered an optometry exam. (*Id.* ¶ 44). The last treatment note from Defendant is dated October 17, 2013 and states that Plaintiff is "insulin dependent" with "stable" glucometer and blood pressure readings. (Doc. 134 ¶ 22; Doc. 130-1, at 35).

### E. Treatment from October 26, 2013 through 2015

On October 26, 2013, Plaintiff was taken to the health clinic with a painful "golf ball sized" lump on the right side of his neck and a swollen throat. He was treated with pain medication. The next day, Plaintiff was having trouble swallowing and there was a "foul odor" coming out of his mouth. (Doc. 130 ¶¶ 23; Doc. 130-1, at 36-38). Plaintiff was ultimately admitted to the infirmary on October 28, 2013, and had to remain there until November 8, 2013. After being discharged, Plaintiff continued to take oral antibiotics for another 10 days. (Doc. 130 ¶ 24).

On November 25, 2013, Plaintiff was transferred to Dixon Correctional Center. (Doc. 130 ¶ 25; Doc. 132 ¶ 47; Doc. 123-1, at 173). He had a focused diabetes evaluation on December 17, 2013, and reported "numbness/tingling pain in his legs." In addition to insulin therapy, the doctor prescribed a low sugar and low fat diet. (Doc. 130 ¶ 26). A few months later, on February 3, 2014, Plaintiff asked to see an eye doctor because of issues he was experiencing while reading and obscured vision in his right eye. (Doc. 130 ¶ 27; Doc. 130-3, at 2). When Dr. David T. Hicks examined Plaintiff on March 18, 2014, he noted retinopathy and macular area changes in Plaintiff's right eye. (Doc. 130 ¶ 28; Doc. 130-1, at 79).

In November 2014, Plaintiff was transferred to East Moline Correctional Center, and by the end of the year, he was complaining that he "can't see" from his right eye for

the previous three months.  (Doc. 130 ¶¶ 31, 32).  On February 26, 2015, Plaintiff had an annual optometric exam conducted by Ned B. Hubbard, O.D.  Plaintiff reported decreased visual acuity in his right eye since September 2014, and Dr. Hubbard referred him to a retinal specialist due to a possible macular edema secondary to his diabetes.  (Doc. 130 ¶ 33; Doc. 130-1, at 86).  Plaintiff saw Dr. Min Han on March 27, 2015, and was diagnosed with diabetic background retinopathy and diabetic macular edema.  Dr. Han recommended that Plaintiff return for a fluorescein angiogram, which the doctor performed on May 11, 2015.  (*Id.* ¶¶ 34, 35).  A little more than a week later, on May 21, 2015, Dr. Han gave Plaintiff an intravitreal steroid injection.  When this measure proved unsuccessful, Dr. Han performed laser surgery on Plaintiff's right eye on June 22, 2015.  (*Id.* ¶ 36).

The last available treatment note is from Plaintiff's follow-up visit with Dr. Han on September 11, 2015.  Plaintiff complained that his vision seemed worse since the laser treatment, and he was experiencing blurring in his right eye.  Dr. Han recommended that Plaintiff maintain good blood sugar control and return again in 3 to 4 months.  (Doc. 130 ¶ 37; Doc. 132 ¶ 54; Doc. 130-1, at 101, 104).

## DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is proper when the "'materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials' show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Baines*

*v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting FED. R. CIV. P. 56(a)). The party opposing summary judgment "cannot merely rest on its pleadings; it must affirmatively demonstrate, by producing evidence that is more than 'merely colorable' that there is a genuine issue for trial." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

At the summary judgment stage, a court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. *See also Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (at summary judgment, courts do not "weigh evidence or determine credibility of . . . testimony."). In making this determination, courts "draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party[.]" *Continental Cas. Co.*, 427 F.3d at 1041 (quoting *Franklin v. City of Evanston*, 384 F.3d 838, 843 (7th Cir. 2004)).

**B.     Analysis**

Defendant seeks summary judgment on Plaintiff's Section 1983 claim and the two infliction of emotional distress claims. The Court addresses each argument in turn.

**1.     Deliberate Indifference**

"Prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment when they act with deliberate indifference to the serious medical needs of prisoners." *Cesal v. Moats*, 851 F.3d 714, 720-21 (7th Cir. 2017). To prevail on his deliberate indifference claim, Plaintiff must satisfy both an objective and a subjective

component by showing that: (1) he suffered an objectively serious medical condition, and (2) Defendant acted with deliberate indifference to that condition. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical condition is objectively serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). There is no dispute here that Plaintiff's type 2 diabetes mellitus is an objectively serious medical condition.

Turning to the subjective component, Plaintiff must show that Defendant acted with a "sufficiently culpable state of mind," meaning that she "knew of a substantial risk of harm to the inmate and disregarded the risk." *Roe*, 631 F.3d at 857 (quoting *Greeno*, 414 F.3d at 653). This requires more than evidence of negligence or medical malpractice. *Cesal*, 851 F.3d at 724. Rather, "[d]eliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007)). "Making that showing is not easy: 'A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.'" *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). Deliberate indifference may also occur where a prison official "acts in a manner contrary to the recommendation of specialists, . . . or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain

and suffering." *Perez*, 792 F.3d at 777 (citing *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011), and *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)).

Defendant insists that the treatment she provided Plaintiff cannot have been "blatantly inappropriate" because her retained experts – Steven R. Shelton, M.D., a Certified Correctional Health Professional with Advanced Standing, and Mark R. Molitch, M.D., a board-certified endocrinologist – both submitted reports opining that she at all times complied with the applicable standard of care. (Doc. 114, at 7; Doc. 115-9, at 111-21; Doc. 115-11, at 105-14). In Defendant's view, "it is difficult to see how care could be 'blatantly inappropriate' when there are learned medical experts declaring the care appropriate and concurring with the medical decisions that were made." (*Id.*).

One flaw in Defendant's reasoning is that her experts routinely construed the facts in a light most favorable to Defendant in order to reach their conclusions, whereas this Court must construe them in a light most favorable to Plaintiff. For example, Dr. Shelton testified that Plaintiff never complained of any "signs or symptoms or any issues" between March 13 and July 24, 2013. (Doc. 123-9, at 12, Shelton Dep., at 45). Yet Plaintiff testified that he made multiple requests for diabetes treatment during that period, including directly to Defendant. According to Plaintiff, during an examination with Defendant on May 9, 2013, he told her he was diabetic, explained that he had been at the NRC since March, and asked about receiving insulin and Accu-Cheks. (Doc. 123-1, at 21-22, Williams Dep., at 84-85). Defendant's treatment note from May 9 arguably confirms Plaintiff's assertion in that it states: "I didn't believe he was on insulin. I told him no insulin [illegible] his records. His records confirm he was never on insulin." (Doc. 130-1, at 33). Dr. Shelton downplayed the significance of the May 9th note, however, by offering his own

interpretation of what he thinks Defendant meant when she wrote it: "I think that the discussion of insulin is correcting his [Plaintiff's] belief that she was disregarding his back pain."[3] (Doc. 123-9, at 41-42, Shelton Dep., at 161-62).

It is not at all clear how Dr. Shelton would know what was in Defendant's mind back in May 2013, and elsewhere during his deposition he declined to engage in such speculation. When asked about a July 24, 2013 treatment note showing Plaintiff had an Accu-Chek reading of 426, Dr. Shelton insisted that "it's not proven that that's a blood glucose reading" and he did not want to "jump to unproven facts that the 426 is a blood glucose." (*Id.* at 48, Shelton Dep., at 186; Doc. 130-1, at 33). (*See also id.*, Shelton Dep., at 189) (questioning whether Plaintiff's attorney "asked [Defendant] what those numbers meant, maybe we could shortcut the whole process if you've asked her and have that documentation somewhere."). Dr. Shelton accepted at face value, however, Defendant's position that Plaintiff "could go back and get a blood sugar [test] anytime he wanted," (*Id.* at 43, 44, 51, Shelton Dep., at 169, 171, 199), ignoring Plaintiff's contrary testimony that he repeatedly sought blood sugar checks and other diabetes treatment to no avail.[4] All of these factual disputes must be resolved by a jury.

Further undermining Defendant's assertion that her expert reports conclusively refute any claim of deliberate indifference is the fact that Plaintiff submitted a report from

---

[3] Dr. Molitch similarly construed Defendant's treatment notes in a light most favorable to her. At his deposition, he testified that when Defendant wrote "WANTS INSULIN??" in all caps in her March 4, 2013 note, she was simply "wondering whether [Plaintiff] really needed insulin" and was "concerned about him getting hypoglycemic." (Doc. 123-8, at 30, Molitch Dep., at 111).

[4] Dr. Molitch similarly testified to his understanding that "if the patient requests a visit for the diabetes control, . . . that appointment would be made." (Doc. 123-11, at 20, Molitch Dep., at 217). He also assumed that "the only reason . . . why [Accu-Cheks] wouldn't have been done [after March 13, 2013] is because [Plaintiff] had refused to have that done." (*Id.* at 21, Molitch Dep., at 223).

his own expert, Marla S. Barkoff, M.D., opining that the care Defendant provided him "substantially departed from accepted professional judgment, standards, and practice." (Doc. 123-4, at 108). Among Dr. Barkoff's criticisms is Defendant's decision to discontinue all of Plaintiff's medications upon his arrival at the NRC, even though Dr. Baker had just prescribed them two days earlier. Dr. Barkoff also takes issue with Defendant's failure to monitor Plaintiff's diabetes between March 14 and July 24, 2013, which she says contributed to his development of "retinopathy, acute infections, worsening neuropathy, and other immeasurable microvascular damage." (*Id*. at 118-20, 125). If a jury agrees with Dr. Barkoff's assessment, and makes certain credibility findings in Plaintiff's favor, it could reasonably conclude that Defendant acted with deliberate indifference by making treatment decisions that were "so significant a departure from accepted medical standards or practices that it calls into question whether [she] actually was exercising [her] professional judgment." *Pyles*, 771 F.3d at 409 (citing *Roe*, 631 F.3d at 857). Summary judgment is not appropriate in such circumstances. *Giles v. Ludwig*, No. 12 C 6746, 2014 WL 4358475, at *3 (N.D. Ill. Sept. 3, 2014) ("Resolution of competing experts' opinions requires credibility determinations that are inappropriate for the Court to engage in at the summary judgment stage.").

Defendant insists that the existence of competing expert reports is insufficient to send a deliberate indifference claim to a jury. (Doc. 135, at 3-4). To be sure, a mere "difference of opinion among physicians on how an inmate should be treated cannot support a finding of deliberate indifference." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (no deliberate indifference where the defendant "was presented with two differing medical opinions" regarding the severity of the plaintiff's arthritis and accepted

13

the more conservative viewpoint); *Hartman v. Foster*, No. 11 C 3132, 2014 WL 128158, at *1 (C.D. Ill. Jan. 14, 2014) ("Different professional approaches to treating a condition is not evidence of deliberate indifference.").

Here, Dr. Barkoff's characterization of Defendant's chosen course of treatment as a substantial departure from accepted medical judgment presents far more than a simple disagreement regarding treatment options. A jury could reasonably infer from Dr. Barkoff's opinion and other evidence that Defendant "knew better than to make the medical decisions that [she] did" and so acted with deliberate indifference to Plaintiff's medical needs. *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016). *Compare Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663 (7th Cir. 2016) (summary judgment appropriate on deliberate indifference claim where "no expert testified that [the defendant's] chosen course of treatment was a substantial departure from accepted medical judgment.").

Defendant's reliance on *Davis v. Ghosh*, No. 13 C 4670, 2015 WL 3396805 (N.D. Ill. May 26, 2015), does not support a different conclusion. The plaintiff in *Davis* alleged that the defendant denied him care and treatment for severe headaches and high blood pressure. In fact, the evidence showed that the doctor "continually treated" the plaintiff and "his symptoms improved under [the defendant's] treatment regimen." *Id.* at *5. Moreover, the physicians who treated the plaintiff after the defendant retired "followed nearly identical treatment plans." The court held that the plaintiff "cannot claim that [the defendant's] treatment was a substantial departure from professional standards when other physicians followed an identical, or nearly identical plan." *Id.*

Unlike in *Davis*, Plaintiff charges Defendant with *not* providing consistent treatment, causing his condition to *deteriorate* over time. Nor is there any evidence that other physicians followed Defendant's same treatment plan in caring for Plaintiff. To the contrary, Defendant discontinued all four prescription medications that another doctor had ordered for Plaintiff just one day before Defendant saw him on March 4, 2013.

Viewing the evidence in a light most favorable to Plaintiff as required in deciding this motion for summary judgment, a reasonable jury could conclude that Defendant was deliberately indifferent to Plaintiff's need for proper diabetes treatment. Defendant's motion for summary judgment on the Section 1983 claim is therefore denied.

### 2. Negligent Infliction of Emotional Distress

Defendant next argues that she is entitled to summary judgment on Plaintiff's claim for negligent infliction of emotional distress ("NIED") because he did not suffer any physical injury resulting from the emotional distress caused by Defendant's alleged medical malpractice. (Doc. 114, at 8, 9). This argument is premised on an incorrect interpretation of Illinois law. To establish a claim for NIED, a plaintiff must prove "the traditional elements of negligence: duty, breach, causation, and damages." *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, at ¶ 31 (2016). With respect to damages, Illinois courts draw a distinction between "bystanders" and "direct victims." *See Corgan v. Muehling*, 143 Ill. 2d 296, 303-05, 574 N.E.2d 602, 605-06 (1991). Bystanders must satisfy the "zone of physical danger" test, which limits potential recovery to those individuals "in a zone of physical danger . . . who, because of the defendant's negligence, [had] reasonable fear for [their] own safety" which caused them emotional distress, and who could demonstrate physical injury or illness resulting from the emotional distress.

15

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009) (quoting *Kapoulas v. Williams Ins. Agency, Inc.*, 11 F.3d 1380, 1382 (7th Cir. 1993), and *Rickey v. Chicago Transit Auth.*, 98 Ill. 2d 546, 555, 457 N.E.2d 1, 5 (1983)).

In contrast, direct victims of alleged NIED must satisfy the "impact" rule. This requires a showing that the victim's emotional distress was accompanied by a "contemporaneous physical injury or impact." *Corgan*, 143 Ill. 2d. at 303, 574 N.E.2d at 605 (quoting *Rickey*, 98 Ill. 2d at 553, 457 N.E.2d at 2). Unlike bystanders, direct victims do not need to suffer "physical manifestations resulting from the emotional distress as a prerequisite to recovery; emotional injuries alone will suffice." *Lewis*, 561 F.3d at 703. *See also Schweihs*, 2016 IL 120041, at ¶ 42.

Plaintiff alleges that he was a direct victim of Defendant's medical malpractice, not a bystander. Defendant appears to acknowledge that the impact rule governs in such circumstances, but she then applies the zone of physical danger test in arguing that Plaintiff has failed to establish a physical injury or illness resulting from the emotional distress. (Doc. 114, at 9). There is no such requirement for direct victims, and Defendant ultimately concedes this in her reply brief. (Doc. 135, at 5). *See Kapoulas*, 11 F.3d at 1385 ("Illinois law does not require a causal nexus between emotional distress and a physical injury" in a direct impact case). Once again viewing the evidence in a light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Plaintiff suffered emotional distress as a result of Defendant's allegedly inadequate medical care, which he says caused "diabetic toxicity" leading to "a serious fungal infection, 10 days in an infirmary, eye surgery, permanent vision loss, [and] lasting neuropathy." (Doc. 129, at 10).

Defendant raised only one other argument relating to the NIED claim in her opening brief, consisting of a generic assertion that Plaintiff "cannot demonstrate that he suffered the type of emotional distress necessary to support a claim for negligent infliction of emotional distress." (Doc. 114, at 9). Ordinarily, such "'perfunctory and undeveloped' arguments are deemed waived." *U.S. v. Collins*, 796 F.3d 829, 836 (7th Cir. 2015).[5] Regardless, the Seventh Circuit made clear in *Lewis v. CITGO Petroleum Corp.* that it has "faith in the ability of jurors to fairly determine what is, and is not, emotional distress," and that "any [NIED] claims of even arguable merit must be given to the jury to consider" unless it would be a waste of judicial time and resources. 561 F.3d at 708 (quoting *Corgan*, 143 Ill. 2d at 312, 574 N.E.2d at 609) (granting summary judgment on NIED claim where the plaintiff alleged she suffered "mild anxiety that causes her to recheck her work, but that only minimally interferes with her everyday life and for which she has not sought treatment.").

Plaintiff has alleged that due to his lack of diabetes treatment, he "'cried like a baby all the time' because 'nobody cared about [him].'" (Doc. 129, at 14; Doc. 123-4, at 106). He also testified about the many (unsuccessful) attempts he made to secure medical care between March 13 and July 24, 2013. For example, Plaintiff "pushed the emergency button for the nurse" on numerous occasions; told officers "and anybody on the gallery" that he needed to see a doctor for insulin; sent 10 to 15 sick requests inquiring about insulin; wrote a letter to the warden; wrote another letter to a woman who worked in the mailroom; and even sent two letters addressed to Defendant. At times he "hollered out

---

[5]     Defendant's conclusory assertion that Plaintiff "cannot satisfy any of the elements required" for an NIED claim, (Doc. 114, at 9), fails for this reason.

of the door" for a doctor "as loud as I could as long as I could."  (Doc. 123-1, at 23-27, Williams Dep., at 90-95, 97-101, 106).

In addition to these measures, Plaintiff submitted grievances in May and June 2013 stating that he had been experiencing symptoms of hypoglycemia several nights a week and expressing concern that his life could be in "jeopardy."  (Doc. 123-1, at 98; Doc. 130-1, at 28).  Defendant objects generally that the statements in Plaintiff's grievances are inadmissible hearsay, (Doc. 134 ¶¶ 12, 15, 16, 29), but he will certainly be allowed to provide direct testimony about these feelings at trial independently of the grievance documents.

Construing the evidence in a light most favorable to Plaintiff, the Court is unable to conclude on the record presented that no reasonable jury could find that he suffered severe emotional distress as a result of Defendant's care.   Defendant's motion for summary judgment is therefore denied.

### 3.     Intentional Infliction of Emotional Distress

Defendant finally seeks summary judgment on Plaintiff's claim for intentional infliction of emotional distress ("IIED").  To prevail on this claim, Plaintiff must establish three elements:  (1) "the conduct involved must be truly extreme and outrageous"; (2) "the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress"; and (3) "the conduct must in fact cause *severe* emotional distress."   *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 269, 798 N.E.2d 75, 80 (2003) (quoting *McGrath v. Fahey*, 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809 (1988)) (emphasis in original).  Defendant argues that Plaintiff cannot satisfy any of these requirements.

### a.     Extreme and Outrageous Conduct

Liability for IIED arises "'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Schweihs*, 2016 IL 120041, at ¶ 51 (quoting Restatement (Second) of Torts § 46 comment d, at 73 (1965); *Public Finance v. Davis*, 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767 (1976)). Courts use an objective standard to determine whether conduct is extreme and outrageous based on all of the facts and circumstances of the case. *Duffy v. Orlan Brook Condominium Owners' Ass'n*, 2012 IL App (1st) 113577, at ¶ 36 (2012). The Illinois Supreme Court "has described a number of nonexclusive factors that may inform this analysis, including:  the degree of power or authority which a defendant has over a plaintiff; whether the defendant reasonably believed that his objective was legitimate; and whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition or peculiarity." *Cobige v. City of Chicago*, No. 06 C 3807, 2009 WL 2413798, at *13 (N.D. Ill. Aug. 6, 2009) (quoting *Lewis v. School Dist. #70*, 523 F.3d 730, 747 (7th Cir. 2008)). In addition, a pattern of misbehavior may raise offensive acts into actionably outrageous ones. *Id.*

Defendant argues that no reasonable jury could find that her conduct was extreme and outrageous because she provided him with at least some amount of medical care (for example, ordering twice-daily Accu-Cheks with no stop date). (Doc. 114, at 10). Defendant also insists that treatment cannot "go beyond all possible bounds of decency" when "reviewing experts [Dr. Shelton and Dr. Molitch] have determined that the treatment

in question was appropriate and within the applicable standard of care." (*Id.* at 11). This Court disagrees.

As noted earlier, Defendant's experts construed the facts in a light most favorable to Defendant in order to reach their conclusions. When the facts are construed in a light most favorable to Plaintiff as required in deciding this motion for summary judgment, a reasonable jury could conclude that Defendant's treatment protocol was so blatantly inappropriate (as Dr. Barkoff opines) that "a reasonable person would hear the facts and be compelled to feelings of resentment and outrage." *Parker v. Side by Side, Inc.*, 50 F. Supp. 3d 988, 1023 (N.D. Ill. 2014) (citing *Duffy*, 2012 IL App (1st) 113577, at ¶ 36). Ignoring the Cook County pharmacy sheet with the prescriptions Dr. Baker had ordered for Plaintiff, Defendant discontinued all of his diabetes and blood pressure medications. Then Plaintiff stopped receiving Accu-Cheks after only 9 days for no documented reason. He says he was experiencing hypoglycemic events several nights a week, and by July 24, 2013, his blood sugar was at a dangerous level, spiking as high as 426. Defendant prescribed insulin at that point but Plaintiff's blood glucose levels remained uncontrolled, with morning readings averaging 223.

Plaintiff has also presented evidence that Defendant knew he suffered from diabetes and required consistent monitoring, but ignored his requests for treatment. Defendant indicated in her treatment notes that she did not believe Plaintiff when he said he had been on insulin prior to his arrival at NRC in March 2013, yet she remembered having prescribed him insulin in April 2009. Plaintiff says he repeatedly requested diabetes treatment over the next few months, including during an examination with Defendant in May 2013, but Defendant ignored his stated need for insulin and failed to

schedule any follow-up appointments to evaluate him. She did not even administer an Accu-Chek to assess his blood sugar level.

When Defendant saw that Plaintiff's blood glucose level was dangerously high on July 24, 2013, her treatment note no longer suggested she did not believe Plaintiff had been on insulin at all, and instead indicated he had been "vague about his diabetic insulin." *See Dixon v. County of Cook*, 819 F.3d 343, 351 (7th Cir. 2016) (IIED claim was not appropriately dismissed where the defendants may have known the plaintiff was in severe pain (and so not malingering) and "nonetheless provided no immediate respite."). Notably, as a pre-trial detainee at the NRC, Plaintiff was subject to Defendant's control with respect to his medical treatment and could not secure needed diabetes care on his own. "The more control which a defendant has over the plaintiff, the more likely the defendant's conduct will be deemed outrageous." *Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006) (quoting *McGrath*, 126 Ill. 2d at 86-87, 533 N.E.2d at 809).

Viewing the facts most favorably to Plaintiff, there is a question of fact as to whether Defendant knew he needed diabetes treatment, knew the potential severe consequences of a lack of treatment, and refused to provide appropriate care despite repeated requests.

### b. Intent or Reckless Disregard

The second element of an IIED claim "inquires as to whether the actor either intended that his conduct inflict severe emotional distress or knew that there was at least a high probability that his conduct would cause such distress." *Honaker v. Smith*, 256 F.3d 477, 494 (7th Cir. 2001). Plaintiff may satisfy this element by showing that Defendant's actions, by their very nature, "were likely to cause severe distress" or that

Defendant "knew that [P]laintiff was particularly susceptible to such distress." *Cobige*, 2009 WL 2413798, at *14 (quoting *Honaker*, 256 F.3d at 494).

Defendant claims that she used her medical judgment in caring for Plaintiff's diabetes and in no way intended to cause him severe emotional distress or knew there was a high probability that her conduct would cause such distress. (Doc. 114, at 11-12). Plaintiff has produced contrary evidence, however, from which it is possible a jury could infer that Defendant at a minimum recklessly disregarded the probability that Plaintiff would suffer severe emotional distress by her alleged refusal to prescribe him insulin or other proper diabetes care. As noted, Plaintiff claims that he repeatedly sought diabetes treatment but Defendant summarily dismissed his need for care and unilaterally discontinued medications that had just been prescribed by a medical doctor. If this testimony were credited by a jury, it could conclude that Defendant recklessly ignored the likelihood that a longstanding diabetic like Plaintiff would experience severe emotional distress if his treatment was withheld, exposing him to risk of blindness and other serious injuries. This suffices to defeat a motion for summary judgment.

### c.   Plaintiff's Emotional Distress

The last element of an IIED claim requires that Plaintiff show Defendant's conduct actually caused him severe emotional distress. Defendant states in conclusory fashion that "[t]here is no evidence in the record that Plaintiff suffered emotional distress, let alone <u>severe</u> emotional distress, as a result of Defendant['s] conduct." (Doc. 114, at 12) (emphasis in original). As discussed earlier, however, Plaintiff has presented evidence that he "cried like a baby all the time" because "nobody cared about [him]," experienced symptoms of hypoglycemia several nights a week, and was afraid that his life could be in

"jeopardy." He also made repeated pleas for medical attention, at times even "hollering out of the door" for a doctor "as loud as I could as long as I could." Once again, if the jury credits Plaintiff's statements, it could reasonably conclude that he was deeply worried about his lack of medical treatment and the implications it might have on his health, and suffered severe emotional distress when his pleas for help went unanswered for so long.

Moreover, as Plaintiff notes, "even when significant evidence was not presented as to the severity of distress, the very nature of the conduct involved may be evidence of its impact on the victim." (Doc. 129, at 14) (quoting *Honaker*, 256 F.3d at 496). "[I]n many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." *Bristow v. Drake Street, Inc.*, 41 F.3d 345, 350 (7th Cir. 1994) (quoting Restatement (Second) of Torts § 46, comment j, p. 78). If a jury concludes that the level of care Defendant provided to Plaintiff would spark outrage, it could also find that the magnitude of her conduct, combined with Plaintiff's desperate pleas for help, crying spells, and fear for his life, suffice to establish severe emotional distress. Defendant's motion for summary judgment on Plaintiff's IIED claim is denied.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment [113] is denied. Jury trial on all claims remains set for June 4, 2018.

ENTER:

Dated: April 26, 2018

_____
SHEILA FINNEGAN
United States Magistrate Judge