# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 C 1691 |
| | ) | |
| MARY DIANE SCHWARZ, P.A., | ) | Magistrate Judge Finnegan |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff William Williams filed this lawsuit under 42 U.S.C. § 1983 alleging that Defendant Mary Diane Schwarz, P.A., was deliberately indifferent to his Type 2 diabetes mellitus while he was a pretrial detainee at the Stateville Northern Reception Classification Center ("NRC"). Plaintiff also asserts state law claims for medical malpractice, negligent infliction of emotional distress, and intentional infliction of emotional distress. Currently before the Court are the parties' motions in limine. For the reasons stated here, the motions are granted in part and denied in part.

## DISCUSSION[1]

### I.     Standard of Review

A motion in limine is "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. U.S.*, 469 U.S. 38, 40 n.2 (1984). *See also Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1055 (N.D. Ill. 2009) (citing *Wilson v. Williams*, 182 F.3d 562, 570 (7th Cir. 1999)) ("A

---

[1]     This opinion assumes the reader's familiarity with the facts of this case as set forth in the Court's April 26, 2018 Memorandum Opinion and Order denying Defendant's motion for summary judgment (Doc. 140). *See also Williams v. Schwarz*, No. 15 C 1691, 2018 WL 1961143 (N.D. Ill. Apr. 26, 2018).

motion in limine is a request for the court's guidance concerning an evidentiary question."). District courts have broad discretion in ruling on motions in limine, but evidence should not be excluded before trial unless it is clearly inadmissible on all potential grounds. *Betts v. City of Chicago, Ill.*, 784 F. Supp. 2d 1020, 1023 (N.D. Ill. 2011); *Gomez v. Palmer*, No. 11 C 1793, 2016 WL 212800, at *1 (N.D. Ill. Jan. 19, 2016). Otherwise, rulings should be deferred until trial so that questions of foundation, competency, relevancy, and potential prejudice may be resolved in proper context. *Id.* *See also Thomas v. Sheahan*, 514 F. Supp. 2d 1083, 1087 (N.D. Ill. 2007).

"The denial of a motion in limine [to bar evidence] does not mean that the evidence is necessarily admissible, rather, it means only that the party moving in limine has not demonstrated that there is no possible basis for the admission of the evidence." *Austin v. Cook County*, No. 07 C 3184, 2012 WL 1530452, at *1 (N.D. Ill. Apr. 30, 2012). Accordingly, "[t]rial judges may alter prior 'in limine rulings, within the bounds of sound judicial discretion.'" *Kiswani v. Phoenix Sec. Agency, Inc.*, 247 F.R.D. 554, 557 (N.D. Ill. 2008) (quoting *Townsend v. Benya*, 287 F. Supp. 2d 868, 872 (N.D. Ill. 2003)).

## II. Relevant Background

Before turning to the motions in limine, the Court provides a brief summary of the relevant facts and allegations taken largely from the parties' agreed statement of the case and proposed jury instructions.

Plaintiff was diagnosed with Type 2 diabetes in 1993 while detained at the Cook County Jail. Since 1993, he has been homeless except when in the custody of the Illinois Department of Corrections or the Cook County Sheriff. At times since 1993, he has been treated for various problems related to diabetes, both while in custody and not in custody.

In 2013, Plaintiff spent nine months at the NRC and was examined by Defendant (a physician assistant) five times between March and October that year. This case concerns Plaintiff's claims that Defendant harmed him when she violated his constitutional rights by being deliberately indifferent to his condition, committed medical malpractice, and negligently and intentionally inflicted emotional distress on him. In support of his assertion that Defendant harmed him, Plaintiff argues that she wrongfully discontinued his prescriptions for blood pressure, pain, and diabetes medications. Then insulin was not prescribed until July 2013 and even then it was allegedly an insufficient dosage and was not increased until October 2013. Plaintiff argues that these actions harmed him by resulting in his uncontrolled blood sugar levels at the NRC. When Defendant failed to follow up on and properly care for Plaintiff (for example by not sending him to a diabetes specialist, requesting a diabetic diet, or screening for microvascular complications of hyperglycemia), she further harmed him by causing him to suffer a serious diabetes-related fungal neck infection in October 2013 for which he spent 10 days in the infirmary. As still further evidence that Defendant improperly cared for and harmed him, Plaintiff points to his loss of vision, his worsening pain, and the loss of sensation in his extremities that he has experienced during and since leaving Defendant's watch at the NRC.

During the Final Pretrial Conference on May 23, 2018, Plaintiff's counsel explained that the medical records reflect that Plaintiff's first ever occurrence of retinopathy was approximately two and a half months after he left the NRC and it got progressively worse over the years that followed despite receiving treatment. His vision in both eyes also worsened, and he has more recently become partially blind in his field of vision in his right

eye. Plaintiff's expert, Marla Barkoff, M.D., will elaborate on these progressive injuries, as follows:

- The failure to recognize and manage Plaintiff's elevated blood pressure "directly contributes to eye and kidney damage in addition to increasing his risk of heart disease and stroke." (Doc. 144-1, at 16-17, Barkoff Report ¶ 23).

- Poor glucose and blood pressure control while under Defendant's care contributed to the onset of diabetic retinopathy discovered in March 2014, and failure to refer him for a dilated eye exam sooner prevented early detection and intervention. As a result, Plaintiff "now suffers from the permanent retinal damage undoubtedly due to poor glycemic control under Ms. Schwarz's care." (*Id.* at 17, Barkoff Report ¶ 25).

Plaintiff seeks compensation for his physical and emotional harm, which he says Defendant inflicted on him negligently and even intentionally.

Defendant denies that she improperly cared for Plaintiff in 2013. She argues that she properly discontinued the prescriptions that Plaintiff brought with him to the NRC, properly followed up on him, and appropriately refused requests for diabetes medication until he needed it. As for Plaintiff's symptoms and alleged harm, Defendant says Plaintiff was contributorily negligent because over the years since becoming diabetic in 1993, he:

- Engaged in smoking, drinking, and illicit drug use;

- Failed to accurately report his medical history;

- Failed to obtain appropriate medical care while not incarcerated;

- Failed to timely submit requests for access to healthcare services while incarcerated;

- Failed to comply with medical recommendations;

- Failed to submit to blood sugar monitoring; and

- Failed to take his medications as prescribed.

In addition, Defendant asserts that her alleged conduct did not proximately cause Plaintiff's injuries. Defense expert, Mark R. Molitch, M.D., has opined that diabetes is a progressive illness that is "well-known to be associated with multiple, long-term complications that contribute to its significant morbidity and mortality." It is "the leading cause of adult blindness and kidney failure in the U.S." and "the major contributor" to cardiovascular disease. (Doc. 146-1, Molitch Report, at 3). Dr. Molitch states that viewing Plaintiff's level of diabetes control over the course of many years, he would have developed diabetic retinopathy, cellulitis and other complications "regardless of the alleged deficiencies in the care of Ms. Schwarz." (*Id.* at 6, 9).

## III.  Plaintiff's Motion to Exclude the Testimony of Rebecca Roberts, M.D.

Plaintiff's first motion in limine seeks to preclude Rebecca Roberts, M.D., a Cook County Hospital physician, from testifying at the trial. Dr. Roberts saw Plaintiff in the emergency room on October 12, 2016 for complaints of abdominal pain. Plaintiff argues that this entire encounter is irrelevant to the case because Dr. Roberts only saw him on that one occasion, for reasons unrelated to his diabetes, and this was a few years after Defendant stopped treating him. (Doc. 145, at 3). This Court disagrees and so denies the motion except that one limited portion of Dr. Roberts' testimony will be excluded.

Not surprisingly, both sides' experts agree that diabetes is a progressive disease that can lead to serious injuries and that requires proper management and treatment, the lack of which can affect the timing and severity of the disease's symptoms and complications. To that end, these experts have closely examined the totality of Plaintiff's medical records--both before and after his treatment at the NRC in 2013--to understand

how and why the disease progressed as it did and how the diabetes was managed and treated over the years.

Given the progressive nature of the disease and the parties' disputes over contributory negligence and proximate causation (among other disputes), the Court finds that the testimony of Dr. Roberts is relevant. For one thing, based on Plaintiff's reported history of diabetes, Dr. Roberts ordered a blood glucose reading, which came back high between 224 and 229. (Doc. 145-1, at 17-18, 40-41, Roberts Dep., at 16-17, 39-40). In addition, Dr. Roberts indicated in her notes that Plaintiff did not have a regular doctor for follow-up medical care:

> Q. Do you have any recollection of how you knew that he didn't have good follow up?
> A. No, but I know what I do with every single patient. I say, Do you have a regular doctor you see all the time? And when they tell me no, I know that they don't.
> Q. Okay. So if he had answered no to that question, that would have given you reason to [write], "does not have F/U"?
> A. Yes.

(*Id.* at 54, Roberts Dep., at 53). Further, Plaintiff left the hospital against medical advice after receiving a dose of morphine (telling a nurse he was no longer in pain), and before Dr. Roberts had a chance to assess whether his diabetes was under control:

> Q. All right. Do you have enough information to tell us whether or not Mr. Williams had his diabetes in good control on October 12, 2016?
> A. No, because like I said, I didn't know if he took his medicine that morning. I didn't know if he had eaten breakfast. I did not know.
> Q. You didn't have enough information because you had not completed your exam before he left . . . AMA [against medical advice]?
> A. Correct.

(*Id.* at 85-86, 90, Roberts Dep., at 84-85, 89).

Testimony of Dr. Roberts such as that summarized above is relevant to whether Plaintiff was taking reasonable care of his diabetes condition in the Fall of 2016. This in

turn may be considered by the jury in assessing the parties' arguments regarding proximate causation for the claimed injuries and whether Plaintiff acted negligently and thereby contributed to those injuries. Plaintiff's arguments to the contrary go to the weight of the evidence rather than its admissibility. Indeed, Plaintiff does not object to testimony about his alleged poor diabetes control and heroin abuse from medical personnel who treated him in 2016 and 2017, including Michael Schindelbeck, M.D., Tyisha Clary, M.D., and Glen Trammel, P.A. (*See* Doc. 148, Final Pretrial Order, at 5-6). For all of these reasons, the motion to exclude Dr. Roberts' notes and testimony is denied but with one exception noted below.

Dr. Roberts stated that the most memorable part of Plaintiff's visit to the hospital was his sudden departure: after Plaintiff received morphine, he got dressed and then ran down the hall with an IV still in his arm, which was extremely dangerous. (Doc. 145-1, at 61-62, Roberts Dep., at 60-61) (noting that IV infections can be "[h]ighly fatal."). Dr. Roberts will be foreclosed from testifying to the *manner* in which Plaintiff left the hospital (i.e., running away with the IV still in his arm) since the incremental probative value of this particular testimony is substantially outweighed by the danger of unfair prejudice. Plaintiff's motion to exclude this limited portion of Dr. Roberts' testimony is therefore granted. In all other regards, however, Dr. Roberts' testimony is allowed.

## IV. Plaintiff's Motion to Exclude The Expert Report and Testimony of Steven Shelton, M.D.

Plaintiff next seeks to bar the expert report and testimony of Steven R. Shelton, M.D., a Certified Correctional Health Professional with Advanced Standing. Plaintiff argues that Dr. Shelton's report "parrots" the opinions provided by Mark R. Molitch, M.D., a board-certified endocrinologist, and so is needlessly cumulative. (Doc. 146, at 1).

"[T]his district generally prohibits a party from offering multiple experts to express the same opinions on a subject." *Sunstar, Inc. v. Alberto-Culver Co.*, No. 01 C 736, 2004 WL 1899927, at *25 (N.D. Ill. Aug. 23, 2004).[2]  Under Rule 403, "[m]ultiple expert witnesses expressing the same opinions on a subject is a waste of time and needlessly cumulative. It also raises the unfair possibility that jurors will resolve competing expert testimony by 'counting heads' rather than evaluating the quality and credibility of the testimony." *Id.* It may be "more advantageous to have two experts from different fields interpret and assess a body of evidence.   But that does not make their testimony any less needlessly cumulative or unfairly prejudicial." *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2018 WL 1316724, at *3 (N.D. Ill. Mar. 14, 2018).

Plaintiff prepared a chart showing numerous instances where Dr. Shelton and Dr. Molitch provide nearly identical opinions.  For example, both experts agree that:  (1) Plaintiff's existing complications from diabetes would have occurred notwithstanding Defendant's allegedly deficient treatment; (2) it was reasonable for Defendant to order blood glucose monitoring with planned follow-ups; (3) it was reasonable for Defendant to rely on nursing staff to monitor Plaintiff's glucose levels; (4) Defendant's prescription of insulin on July 24, 2013 was reasonable; and (5) Plaintiff's hemoglobin A1c levels were no better before or after Defendant's treatment.  (Doc. 146, at 4-6).  In Plaintiff's view, allowing Dr. Shelton to testify "could cause jurors to resolve competing expert testimony

---

[2]     In a "Supplemental Authority Submission" filed on May 24, 2018, Plaintiff purported to quote from the *Sunstar* opinion, stating it set forth a "one-expert-per-topic-per-party rule."  (Doc. 155, at 4) (quoting *Sunstar, Inc. v. Alberto-Culver Co.*, No. 01 C 736, 2004 WL 2725461 (N.D. Ill. Apr. 26, 2004)).  In actuality, the quoted language is from a Reply Memorandum of Law in that case rather than a judicial opinion.

in this case by 'counting heads' and speculating why Williams did not produce as many experts as Schwarz." (*Id.* at 6).

In her response brief, Defendant appeared to concede that the experts' testimony could be "potentially cumulative," but stated that "for most opinions" there would be no overlap. (Doc. 150, at 2). During the Final Pretrial Conference, however, Defendant insisted that her experts will not duplicate each other's opinions in any respect. Dr. Shelton, who is familiar with the provision of medical services in a correctional setting, will provide testimony regarding the standard of care and opine that Defendant at all times acted reasonably and within that standard of care based on the circumstances presented. Dr. Molitch, on the other hand, will be called to testify about disease progression for diabetes and opine that Defendant's actions (even if found to be below the standard of care) did not cause the claimed injuries since the retinopathy, diabetic neuropathy, and other conditions were going to occur regardless of the alleged inadequate medical treatment over the nine months in question.

With this clear delineation of topics, the testimony from Dr. Shelton and Dr. Molitch will not be cumulative because each will address entirely separate matters. *Cf. Sunstar, Inc.*, 2004 WL 1899927, at *25 (disallowing "[m]ultiple expert witnesses expressing the *same* opinions on a subject.") (emphasis added). *See also Hall v. Hall*, No. 14 C 6308, 2018 WL 1695365, at *4 (N.D. Ill. Apr. 7, 2018) (Kennelly, J.) (finding that two experts could not provide identical conclusions on the same topic, but allowing both to testify on discrete matters). If a defense expert attempts to testify at trial on topics already covered by the other defense expert, this Court will sustain an objection that the testimony is cumulative and exclude the testimony.

Plaintiff insists that the testimony should still be excluded because Dr. Shelton was never presented as an expert on prison medicine. Dr. Shelton's report clearly states, however, that he is a Certified Correctional Health Professional – Advanced Standing, and that he worked for more than 20 years as the Medical Director for Health Services for the Oregon Department of Corrections. (Doc. 146-2, Shelton Report, at 2). In addition, his disclosure contained multiple opinions regarding the provision of medical services in a prison setting. (*See Id.* at 5-6). Based on this, the fact that Dr. Shelton would be testifying as an expert on prison medicine cannot be a surprise to Plaintiff.

Finally, Plaintiff objects that Dr. Shelton has never been to Illinois or the NRC and so has no relevant knowledge about that facility. This goes to the weight rather than the admissibility of the testimony. Plaintiff's motion in limine to exclude Dr. Shelton's testimony is denied.[3]

## V.  Plaintiff's Motion to Exclude Evidence of His Past Behaviors to Support a Contributory Negligence Defense

At the Final Pretrial Conference on May 23, 2018, Plaintiff argued for the first time that Defendant should be barred from introducing evidence of his past behaviors to support her contributory negligence defense. Plaintiff claims that his history of smoking, drinking, and using illegal drugs is irrelevant because Defendant allegedly cannot link those behaviors to the injuries he sustained. (Doc. 155, at 1-2). Plaintiff also objects that

---

[3]     The Court also denies Plaintiff's request at the Final Pretrial Conference to submit a brief regarding why Dr. Shelton should be foreclosed from testifying based on his lack of knowledge of prison medicine as practiced in Illinois and at the NRC (as opposed to Oregon prisons), or alternatively, to voir dire the expert before he is allowed to provide any opinions. Plaintiff was given a detailed expert disclosure, and the time for *Daubert* motions is long past. Plaintiff's counsel certainly may cross-examine Dr. Shelton concerning the fact that he has never served as a doctor within a prison in Illinois and the jury may then consider this in deciding what weight to give the expert's testimony.

Defendant only wants to mention the evidence "for the threadbare purpose of prejudicing the jury against him." (*Id.* at 3). Since the parties were to file all motions in limine by May 8, 2018 (extended from May 4) with responses by May 11, 2018, this motion is untimely and denied for that reason. (Doc. 143). *See Pearl v. Keystone Consol. Indus., Inc.*, 884 F.2d 1047, 1052 (7th Cir. 1989) (district court did not abuse discretion in denying an untimely motion in limine). In addition, the two-page motion is undeveloped in describing the evidence and is lacking in merit.

As noted, Dr. Molitch and Dr. Barkoff both agree that diabetes is a progressive disease that will worsen without proper treatment and observation. In addition, Dr. Barkoff indicated at her deposition that use of alcohol, tobacco and illegal drugs could potentially affect a person's blood sugar control in certain ways. On the record presented, Plaintiff has not established that no reasonable jury could conclude that his drinking, smoking, and drug use had an effect on his diabetes progression, and the jury will be permitted to hear and weigh this evidence. Like the evidence of how Plaintiff managed the disease after leaving the NRC in 2013, this evidence of what occurred before he entered the NRC is relevant to the disputed issues, including whether Defendant's conduct proximately caused the claimed injuries, and whether Plaintiff is contributorily negligent.

The cases Plaintiff cites do not support a different conclusion. Not only are most of them from other states, but none addresses a plaintiff suffering from a progressive disease like diabetes. *Compare Matthews v. Williford*, 318 So.2d 480, 483 (Fla. Dist. Ct. App. 1975) (patient's conduct that may have contributed to his having a heart attack not relevant to whether the defendant wrongfully caused the patient's death while treating him for that heart attack); *Harding v. Deiss*, 3 P.3d 1286, 1289 (Mont. 2000) (patient's

conduct in going horseback riding, which triggered an asthma attack, not relevant to whether the doctors who treated her negligently caused her death; "[C]omparative negligence as a defense does not apply where a patient's pre-treatment behavior merely furnishes the need for care or treatment which later becomes the subject of a malpractice claim."). The cases are also distinguishable because unlike here, there was no expert testimony linking the prior behavior to the alleged injury. *Cf. Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 60, 733 N.E.2d 1275, 1281 (2000) (in car accident case, court erred in admitting evidence of the plaintiff's prior history of unspecified neck problems because there was no expert testimony establishing the nature of the prior neck problems or the relationship between those problems and the plaintiff's current claim).[4]

For the reasons stated, Plaintiff's motion in limine to exclude evidence of his past behavior is denied.

## VI.    Defendant's Motions in Limine

### A.    Motion No. 1 to Bar or Limit the Testimony of Marla Barkoff, M.D.

In her first motion in limine, Defendant raises several arguments aimed at barring or limiting the testimony of Plaintiff's expert, Marla Barkoff, M.D. The Court addresses each in turn.

---

[4]     Once again, one of the cited "cases" is not a case at all, but an Appellate Brief. (Doc. 155, at 2) (citing *Krklus v. Stanley*, 2004 WL 5686547 (1st Dist. June 25, 2004)). Notably, the Illinois Appellate Court ultimately held in *Krklus* that the trial court properly admitted evidence that the plaintiff was contributorily negligent in failing to follow the defendant's advice to take prescribed medication, which complicated treatment and reduced his chances of survival. *Krklus v. Stanley*, 359 Ill. App. 3d 471, 485, 833 N.E.2d 952, 964 (1st Dist. 2005).

### 1. Bar Dr. Barkoff's Testimony as to the Standard of Care for a Physician Assistant

Defendant argues that Dr. Barkoff, a medical doctor, should not be allowed to offer any testimony regarding the standard of care applicable to Defendant, a physician assistant. This argument arises out of Illinois medical malpractice law, which requires that an expert "must be a licensed member of the school of medicine about which the expert proposes to express an opinion." *Alm v. Loyola Univ. Med. Ctr.*, 373 Ill. App. 3d 1, 5, 866 N.E.2d 1243, 1247 (1st Dist. 2007). *See also Dolan v. Galluzzo*, 77 Ill. 2d 279, 282, 396 N.E.2d 13, 15 (1979) ("[A] practitioner of one school of medicine is not competent to testify as an expert in a malpractice action against a practitioner of another school of medicine."). The reason behind this rule is to "prevent a higher standard of care being imposed upon the defendant and to ensure that the testifying expert has expertise in dealing with the patient's medical problem and treatment and that the allegations of negligence are within the expert's knowledge and observation." *Wingo by Wingo v. Rockford Mem'l Hosp.*, 292 Ill. App. 3d 896, 906, 686 N.E.2d 722, 728 (2d Dist. 1997).

Here, Dr. Barkoff testified that her knowledge of the standard of care for a physician assistant practicing correctional medicine is based on her review of Illinois Department of Corrections ("IDOC") and Wexford guidelines. (Doc. 144-2, at 9, Barkoff Dep., at 35-36). Defendant argues that since policies and guidelines are not determinative of the standard of care, Dr. Barkoff is not qualified to opine on this issue at trial. (Doc. 144, at 2) (citing *Heastie v. Roberts*, 226 Ill. 2d 515, 553-54, 877 N.E.2d 1064, 1088 (2007)) ("[P]olicies are not determinative of the standard of care, [but] the failure of a hospital to follow its

policies can be evidence of a breach of the hospital's duty to a patient."). *See also* parties' proposed Court's Instruction 17.[5]

Plaintiff argues that this case falls within an exception to the licensure rule that applies where the allegations of negligence "do not concern an area of medicine about which there would be a different standard between physician [sic] and another school of medicine." *Wingo by Wingo*, 292 Ill. App. 3d at 906, 686 N.E.2d at 728. Plaintiff insists there is no concern here that Defendant will be held to a higher standard of care because she "herself has supplied the standard of care upon which Dr. Barkoff opines." (Doc. 147, at 3). Specifically, Defendant testified that she tries to follow the IDOC guidelines for diabetes; she tries to "utilize" the American Association of Diabetes Guidelines; she is authorized to prescribe medicine; and she can order follow-up exams. (*Id.* at 3-4) (citing Doc. 147, at 12-17, Schwarz Dep., at 12-13, 143, 146-47, 209). In Plaintiff's view, since Defendant has set the standard of care, it is not necessary to have another physician assistant testify on this issue. (*Id.* at 4) (citing *Walski v. Tiesenga*, 72 Ill. 2d 249, 259, 381 N.E.2d 279, 284 (1978) ("The testimony of the defendant doctor may be sufficient to establish the standard of care.").

On the record presented, this Court declines to bar in limine any testimony from Dr. Barkoff regarding the appropriate standard of care in this case and whether Defendant complied with it. There has been no suggestion that physician assistants are held to a different standard of care than medical doctors with regard to the treatment at issue here

---

[5]     Proposed Court's Instruction 17 states (in part): "The law does not say how a reasonably careful physician's assistant would act under these circumstances. That is for you to decide. In reaching your decision, you must rely on opinion testimony from qualified witnesses and evidence of professional standards, laws, rules, regulations, policies, procedures, or similar evidence." (Doc. 148, at 34).

as rendered to Plaintiff while at the NRC.  Nor has Defendant articulated any basis for believing that Dr. Barkoff is holding her to a higher standard of care than would otherwise apply to physician assistants.  Notably, in response to Dr. Barkoff's opinion, Defendant retained two expert medical doctors of her own to opine that she met the standard of care. (Doc. 146-1, Molitch Report, at 8, 9) ("Ms. Schwarz's order relating to insulin was reasonable, appropriate, and in compliance with the standard of care."; "Thus, Ms. Schwarz did not deviate in any respect from the standard of medical care for patients with diabetes mellitus . . ."); Doc. 146-2, Shelton Report, at 5 (failure to order insulin or oral medication on March 4, 2013 "was a reasonable judgment within the standard of care."; "Again, the standard of care did not require that insulin or oral medication for diabetes be ordered in this situation [at appointment on March 8, 2013].")).  Other than observing that Plaintiff bears the burden of proof on the standard of care, and that since he disclosed a medical doctor as an expert Defendant felt compelled to do so as well, Defendant offers no explanation for why her medical doctors are qualified to opine on the standard of care for a physician assistant and Dr. Barkoff is not.

Defendant also fails to cite any case suggesting that the Illinois licensure rule applies to claims of deliberate indifference under Section 1983.  Under Rule 702, an expert is qualified to testify on any subject matters that fall within his areas of expertise. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Aside from noting that Dr. Barkoff is not a physician assistant, Defendant makes no argument that as an endocrinologist and diabetes specialist, Dr. Barkoff lacks the knowledge, skill, experience, or education to opine on proper diabetes treatment in the situation presented here. Defendant will certainly be permitted to argue that Dr. Barkoff's statements regarding the

standard of care are incorrect. Defendant's motion to completely preclude Dr. Barkoff from testifying as to the standard of care, however, is denied.

### 2. Bar Dr. Barkoff's Testimony Regarding Defendant's Failure to Order a Lipid Profile and Poor Management of Plaintiff's Blood Sugar

Defendant next seeks to bar Dr. Barkoff from testifying that Defendant deviated from the standard of care by failing to order a lipid profile on Plaintiff and generally mismanaging his blood sugar. (Doc. 144, at 4). Defendant notes that in a medical negligence case, Plaintiff must establish through expert testimony that "an act by the defendant could have, within a reasonable degree of medical certainty, caused the plaintiff's injuries." *Mengelson v. Ingalls Health Ventures*, 323 Ill. App. 3d 69, 74-75, 751 N.E.2d 91, 96 (1st Dist. 2001). In Defendant's view, Dr. Barkoff did not provide the necessary link between the two cited actions and any specific injury to Plaintiff. With respect to the failure to order a lipid profile, Defendant seems to believe that the only injury this could cause is an acute cardiovascular event, which Plaintiff admittedly never suffered. (Doc. 144, at 4). As for the blood sugar management, Dr. Barkoff testified that high sugar levels create an environment that promotes infection, but did not state that Plaintiff's blood sugars affirmatively caused him to suffer a fungal infection and cellulitis. (*Id.*).

To begin, although Plaintiff never suffered a cardiovascular event, Dr. Barkoff has opined that people with diabetes should "limit saturated fats and cholesterol to reduce the risk of cardiovascular disease, a known complication of diabetes." (Doc. 144-1, at 11, Barkoff Report ¶ 4). Moreover, Plaintiff alleges that it was Defendant's totality of care over a nine-month period, and not any one action, that caused his injuries. Dr. Barkoff

opines that Defendant's failure to appropriately manage Plaintiff's blood sugar placed him at "severe risk of acute complications," including infection, vision loss, and neuropathy, all conditions Plaintiff claims to have suffered. (*Id.* at 15, Barkoff Report ¶ 19). Dr. Barkoff also states that Plaintiff's "poor glycemic control was contributing to his persistent fungal infections," and that his "persistent glucose toxic environment likely contributed to [an] acute bacterial infection." (*Id.* at 18, Barkoff Report ¶¶ 29, 30). This testimony is sufficient to raise questions of fact as to whether Defendant's overall course of treatment, including her failure to order a lipid panel and alleged mismanagement of Plaintiff's blood sugar, proximately caused Plaintiff's injuries. *Mengelson*, 323 Ill. App. 3d at 75, 751 N.E.2d at 96 ("It is well established that issues involving proximate cause are fact specific and therefore uniquely for the jury's determination.").

The same is true for Plaintiff's deliberate indifference claim. The Seventh Circuit has recognized that "whether the cause put forth by a qualified expert actually proximately caused the injury at issue is a question for the jury at trial." *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010). Dr. Barkoff's opinion that Defendant's actions exacerbated Plaintiff's medical problems raises questions of fact as to whether Defendant was deliberately indifferent to Plaintiff's serious medical condition, and whether that caused him to suffer harm as a result. *Id.*

For all the reasons stated, Defendant's motion in limine to bar Dr. Barkoff from testifying that Defendant's failure to order a lipid profile and mismanagement of Plaintiff's blood sugar proximately caused his injuries is denied.

### 3. Bar Dr. Barkoff from Providing Pejorative Testimony and Opinions on Defendant's State of Mind

Defendant objects that Dr. Barkoff's opinion is "strewn with personal attacks against Ms. Schwarz that go beyond a clinical examination of the applicable standards of care and her subsequent opinion on whether Ms. Schwarz's care met that standard of care." (Doc. 144, at 6). In this motion, she seeks to bar Dr. Barkoff from making "personal interjections which are pejorative in nature[,]" and identifies a sampling of statements from Dr. Barkoff's report that arguably qualify as such. (*Id.* at 5-6). Relatedly, Defendant seeks to preclude Plaintiff from eliciting opinion testimony from Dr. Barkoff regarding Defendant's state of mind. (*Id.* at 6). The example that is given is testimony related to the following entry in Defendant's treatment notes: "WANTS INSULIN??" (*Id.*). Dr. Barkoff states in her report that the phrase "takes on a mocking tone towards Mr. Williams and denigrates his own medical judgment of himself and his own medical history." (Doc. 144-1, at 12, Barkoff Report ¶ 8). She also views the entry as a "flippant notation" that evidences a "blatant disregard for [Plaintiff's] critical request for insulin." (*Id.*). Defendant objects that this is "merely personal speculation or conjecture" on Dr. Barkoff's part and is not an appropriate subject for expert testimony. (Doc. 144, at 7).

Defendant's motions are denied since Plaintiff is not seeking to offer Dr. Barkoff's expert report into evidence. Instead, the doctor will testify at trial in response to specific questions posed to her, and her testimony may or may not include statements that Defendant views as "pejorative" or that opine on her state of mind. But the Court will provide general guidance to both parties regarding what it deems to be impermissible expert testimony. The parties are directed to share this guidance with their respective experts in order to minimize objections and adverse rulings at trial.

First, the experts may not express opinions on the ultimate issues regarding whether or not a party was "negligent," or whether or not Defendant was "deliberately indifferent" or committed "medical malpractice." "While experts may offer testimony that 'embraces an ultimate issue to be decided by the trier of fact,' . . . expert testimony that is 'largely on purely legal matters and made up of solely legal conclusions' is inadmissible." *Heard v. Illinois Dep't of Corrections*, No. 06 C 644, 2012 WL 2524748, at *5 (N.D. Ill. June 29, 2012) (quoting Fed. R. Evid. 704; *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003)). In *Heard*, for example, the court did not permit the expert to testify that the defendants acted with deliberate indifference, or use the terms "willful and wanton," a legal standard very similar to deliberate indifference. *Id. See also Hall*, 2018 WL 1695365, at *3 ("[N]either expert may properly render an ultimate-issue opinion regarding whether the defendants were deliberately indifferent or negligent or committed malpractice."). In this Court's view, these types of opinions unnecessarily invade the province of the jury which must make the same determination based on its assessment of the evidence.

The experts may, however, offer opinions couched in terms of the underlying requirements necessary for the jury to find deliberate indifference or negligence, along with the supporting factual information. For example, an expert may opine as to whether the plaintiff had a serious medical need or whether the defendant's treatment met the standard of care. *See Hall*, 2018 WL 1695365, at *3 (expert permitted to testify "regarding the applicable standard of care and … compliance with that standard."); *Haney v. Mizell Memorial Hosp.*, 744 F.2d 1467, 1475 (11th Cir.1984) (court reasonably precluded expert

from using the word "negligent" while allowing him to opine that the defendant's conduct fell below the standard of care).

Second, the experts may not testify regarding what another person "believed, understood, or intended, as these are inappropriate subjects for expert testimony." *Hall*, 2018 WL 1695365, at *3. For this reason, if Dr. Barkoff were to opine at trial as to Defendant's state of mind when writing "WANTS INSULIN??" in Plaintiff's medical records, any objection would be sustained. Of course, it would be different if the expert learned the state of mind from the other person who actually described it. For this reason, in forming her opinions, Dr. Barkoff may choose to credit and rely on Plaintiff's statements as to his state of mind at a particular point in time if relevant.

Finally, the experts must avoid unnecessary, conclusory and pejorative characterizations of the evidence and the credibility of witnesses that stray from the relevant issues set forth in the jury instructions and that require medical expertise. Objections to such testimony will be sustained since the probative value of the testimony is substantially outweighed by the danger of unfair prejudice, and essentially transforms the expert into an advocate. *See Hall*, 2018 WL 1695365, at *4 (experts foreclosed from making "pejorative references" that the plaintiff's claims were "completely disingenuous" and that statements of opposing expert were "simply ridiculous" since these statements suggest the testifying expert is "acting as an advocate as opposed to a witness" and are "unfairly prejudicial in a way that significantly outweighs any conceivable probative value that would be derived from a witness communicating this sort of rhetoric in a courtroom.").

This type of testimony also invades the province of the jury which is charged with, and capable of making its own determinations as to the credibility of witnesses and the

weight of the evidence.  Consider, for example, Dr. Barkoff's statement that an entry made by Defendant in the medical records was "blatantly false" and the "fact [Defendant] doesn't believe [Plaintiff's] previous insulin use when she herself prescribed Mr. Williams insulin at Stateville during a previous incarceration *proves* that her medical insight and thoroughness are quite poor."  (Doc. 144-1, at 13, Barkoff Report ¶ 13) (emphasis added). (*See also* Doc. 130-6, at 6, Barkoff Supp. Report ¶ 4) ("[Defendant's] ability at his 3/4/13 intake to schedule follow-up the following week in March 2013 proves that she had the ability to schedule medical follow-up for Mr. Williams when she saw him in May 2013 but chose not to.").   An expert certainly may highlight factual information supporting an opinion regarding whether the standard of care was met (or not) or whether a Plaintiff was denied necessary medical care; however, the expert should refrain from offering opinions as to what has been "proved" (based on the expert tying together various pieces of evidence -- as counsel undoubtedly will do in closing argument), and opinions as to whether an inference can be drawn from the evidence that a statement is "blatantly false." With the aid of the expert's proper opinions on *medical* issues and counsel's closing arguments, the jury is capable of deciding for itself what inferences to draw from the totality of the evidence, whether facts have been "proved" to their satisfaction, and whether any statement is "blatantly false" or not.   In this Court's view, it invades the province of the jury for an expert to express such opinions.

The Court is also concerned that such testimony may result in jury confusion regarding the proper legal standards to be applied by the jury.  For example, Dr. Barkoff's report at times refers to Defendant as lacking the "medical capacity" to care for Plaintiff (Doc. 144-1, at 13, Barkoff Report ¶ 10), and opines that he "deserved better medical

diabetes care than he was provided at Stateville under Ms. Schwarz's duty." (*Id.* at 19). Elsewhere she accuses Defendant of "medical incompetence." (*Id.*). And in a supplemental report, Dr. Barkoff opines that Defendant was "medically reckless." To avoid confusion as to the standard to be applied by the jury in determining liability, the experts should use the standard of care language or other terminology from the jury instructions (except "negligence," "medical malpractice" and "deliberate indifference").

### B. Motion No. 2 to Bar Reference to or Utilization of Plaintiff's Grievances

Plaintiff filed two grievances seeking medical treatment for his diabetes during his stay at the NRC in 2013. The first grievance, dated May 7, 2013, requested emergency care to address symptoms of hypoglycemia several nights a week, but a prison official denied the grievance on May 23, 2013. (Doc. 130-1, at 27-28). Plaintiff submitted a second grievance on June 8, 2013, largely reiterating his previous complaints. On June 13, 2013, a prison counselor indicated on the grievance that a copy "will be forwarded to the HCU [Health Care Unit] for review and response. The original will be sent to the Grievance Officer. When the HCU responds you will receive a final response from the Grievance Officer." (Doc. 123-1, at 95-97). A little more than a month later, on July 24, 2013, Defendant wrote in the subjective portion of a treatment note that Plaintiff "filed [a] grievance [secondary to] his insulin." (PX19).

Defendant seeks to bar Plaintiff from introducing these grievances at trial on the grounds that they constitute inadmissible hearsay under Rule 801. (Doc. 144, at 7). Plaintiff argues they are not hearsay because he plans to use them to show Defendant had notice of his pleas for medical care. (Doc. 147, at 7) (citing *Harden v. Marion County*

*Sheriff's Dep't*, 799 F.3d 857, 861 (7th Cir. 2015)) ("Evidence that is 'used only to show notice' is not hearsay.").

Plaintiff has not provided any evidence suggesting that Defendant ever saw the May 7, 2013 grievance (which was denied by a prison official), so it is not evidence that Defendant knew of Plaintiff's plea for medical care and is inadmissible hearsay. With respect to the June 8, 2013 grievance, there is evidence that a prison counselor sent a copy to the HCU, and Defendant's July 24, 2013 treatment note indicates that Plaintiff told her about a grievance. Yet there is still no evidence that Defendant actually saw the grievance, and if so, when. Given the uncertainty as to when (or if) Defendant saw the June 8 grievance, it is not evidence that Defendant had notice of Plaintiff's requests for medical treatment at any time prior to July 24, 2013 when she wrote her treatment note.[6] The motion in limine to exclude the grievance as inadmissible hearsay is granted.

### C.     Motion No. 6 to Bar Non-Party Witnesses from the Courtroom

In her next motion in limine, Defendant seeks to exclude all non-party witnesses from the courtroom until they are called to testify. The motion is granted without objection with respect to fact witnesses. As for expert witnesses, the motion is denied. Federal Rule of Evidence 615 provides that "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony[;]" however, there is an exception for "a person whose presence a party shows to be essential to presenting the party's claim or defense." FED. R. EVID. 615(c). "The exclusion of fact witnesses rests on

---

[6]     For this reason, Dr. Barkoff may not provide testimony regarding the following opinion: "Despite Mr. Williams's grievance which was filed and stated he requested to resume the diabetes medications which he had been on prior to arrival at Stateville, an additional 10 weeks passed before a glucose level was checked." (Doc. 144-1, at 13, Barkoff Report ¶ 12). Nor may Dr. Barkoff otherwise rely on Plaintiff's statements in the grievance or the content of them as the basis for an opinion regarding Defendant's knowledge.

a concern that having heard the testimony of others, the witnesses may inappropriately tailor their testimony to conform to the testimony of previous witnesses." *Client Funding Solutions Corp. v. Crim*, 943 F. Supp. 2d 849, 868 (N.D. Ill. 2013) (citing *Geders v. United States*, 425 U.S. 80, 87 (1976)).

> No such danger is present with expert witnesses, whose testimony, by nature, is based on facts and information provided by others. Indeed, Federal Rule of Evidence 703 expressly provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed," and the Seventh Circuit has noted that "there is little if any difference between counsel disclosing prior testimony to an expert and having an expert listen to such testimony in the courtroom."

*Id.* at 868-69 (quoting *United States v. Crabtree*, 979 F.2d 1261, 1270 (7th Cir. 1992)). *See also Below by Below v. Yokohama Tire Corp.*, No. 15-CV-529-WMC, 2017 WL 764824, at *7 (W.D. Wis. Feb. 27, 2017) ("The court's general practice is to exclude all lay witnesses from the courtroom until they have completed their testimony, while allowing experts to remain.").

Plaintiff has argued that Dr. Barkoff must be permitted to observe the testimony of Defendant since it is possible, depending on what Defendant says, that Plaintiff will need to call Dr. Barkoff as a rebuttal witness. The Court recognizes that "Rule 703 is not an automatic exemption for expert witnesses from Rule 615 sequestration." *U.S. v. Olofson*, 563 F.3d 652, 660 (7th Cir. 2009). At the same time, "experts who are responding to the theories of an adversary's expert are infrequently sequestered." *Ty Inc. v. Softbelly's Inc.*, No. 00 C 5230, 2006 WL 5111124, at *18 (N.D. Ill. Apr. 7, 2006). *See also Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1209 (5th Cir. 1993) ("Expert witnesses clearly fall within Rule 615([c])'s exception" for persons whose presence is essential to the presentation of a party's case).

Here there is no suggestion that Dr. Barkoff will be providing factual testimony that she could alter to conform with the statements of others. In addition, to the extent that she is properly called as a rebuttal witness, her presence in the courtroom during Defendant's testimony will limit the need to "repeat previous testimony in the form of lengthy hypothetical questions." *United States v. Dimora*, 843 F. Supp. 2d 799, 821 (N.D. Ohio 2012). On the record presented, the Court finds that in light of the uncertainty regarding what Defendant will testify to at trial, Plaintiff has adequately shown that Dr. Barkoff's presence in the courtroom is essential for the management of the case since she may well be necessary as a rebuttal witness.

Defendant's real concern with Dr. Barkoff observing Defendant's testimony (as expressed during the Final Pretrial Conference) is that the expert may then formulate new and undisclosed opinions that she will testify about during her rebuttal testimony. This is a valid concern but not one that justifies exclusion of Dr. Barkoff from the courtroom. Instead, the Court will take a recess before Plaintiff's rebuttal case to learn whether Dr. Barkoff will be called as a witness. If so, the Court will hear in advance what rebuttal testimony is planned and allow Defendant to make objections in the event she will offer testimony that exceeds the scope of proper rebuttal. *See Hill v. Porter Mem'l Hosp.*, 90 F.3d 220, 223 (7th Cir. 1996) (district court did not err in allowing the defendant's experts to testify after reviewing the plaintiff's expert's trial testimony where "[t]hey maintained and testified to the same opinions throughout the case."). *See also Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) ("Testimony offered only as additional support to an argument made in a case in chief, if not offered 'to contradict, impeach or defuse the impact of the evidence offered by an adverse party,' is improper on rebuttal.").

### D.     Motion No. 8 to Bar Plaintiff from Providing Medical or Mental Health Opinions

This motion seeks to preclude Plaintiff (or other unidentified lay witnesses) from offering medical opinions.  (Doc. 144, at 10-11).  The Court agrees generally that lay witnesses such as Plaintiff cannot give medical opinions or testify about causation.  They can, however, testify about their symptoms and course of treatment.  Defendant argues that Plaintiff should not be permitted to say he "needed insulin" or suffered from "hypoglycemia" because these are not things a lay person would know.   Given that Plaintiff has been a diabetic since 1993, he would reasonably know common medical terms related to diabetes and its treatment, and be familiar with how his body reacts when his blood sugar is either too high or too low.  Plaintiff may therefore testify that he needed insulin and suffered from hypoglycemia as long as he explains the specific symptoms that led him to those conclusions.  Defendant will then be free to argue that the symptoms described are not in fact evidence of a need for insulin or associated with episodes of hypoglycemia.  Motion in limine No. 8 is granted in part and denied in part.

### E.     Motion No. 9 to Bar Evidence of Future Physical or Emotional Injury or Treatment

In her next motion in limine, Defendant seeks to bar Plaintiff from arguing that he will incur future medical or mental health expenses because he has not disclosed an expert competent to make such a determination.  (Doc. 144, at 11).  Plaintiff responds that he has presented evidence that his condition is progressive and will require additional medical care in the future, particularly with respect to his eye problems and neuropathy. He also directs the Court to *Maddox v. Rozek*, 265 Ill. App. 3d 1007, 639 N.E.2d 164 (1st Dist. 1994), for the proposition that "Illinois courts have accepted the view that lay

testimony alone, or the nature of an injury, can support an instruction on future pain and suffering." *Id.* at 1009, 639 N.E.2d at 166. As the *Maddox* court explained:

> Where future pain and suffering can be objectively determined from the nature of an injury, the jury may be instructed on future pain and suffering based on lay testimony alone or even in the absence of any testimony on the subject. Where future pain and suffering is not apparent from the injury itself, or is subjective, the plaintiff must present expert testimony that pain and suffering is reasonably certain to occur in the future to justify the instruction.

*Id.* at 1011, 639 N.E.2d at 167.

This motion is denied without prejudice since the Court must hear the evidence of future damages at trial before determining whether a jury could find that future damages are reasonably certain.

### F.    Motions Granted Without Objection or Withdrawn

The following motions are granted without objection:

- Motion in limine No. 3 to bar evidence of any prior or ongoing lawsuits involving Plaintiff or Defendant;

- Motion in limine No. 4 to bar evidence of prior grievances or complaints against Defendant, or Defendant's disciplinary records, if any;

- Motion in limine No. 5 to bar evidence regarding the existence of any liability insurance or indemnification on the part of Defendant;

- Motion in limine No. 7 to bar opinion testimony from any medical treaters not disclosed as expert witnesses;

- Motion in limine No. 10 to bar evidence or testimony critiquing the medical care provided to Plaintiff by non-parties.

Finally, Defendant's motion in limine No. 11, which seeks to bar any argument that Plaintiff is entitled to double recovery on his state and federal claims, is withdrawn without prejudice. The parties have agreed to address this issue through the jury verdict forms. (Doc. 147, at 10).

## CONCLUSION

For the reasons stated above, Plaintiff's Motion in Limine to Exclude the Testimony of Rebecca Roberts, M.D. [145] is granted in part and denied in part. Plaintiff's Motion in Limine to Exclude the Expert Report of Steven Shelton, M.D. [146] is denied. Plaintiff's motion to exclude evidence of his past behaviors to support a contributory negligence defense is also denied. Defendant's Motions in Limine [144] are granted in part and denied in part.

ENTER:

Dated: June 1, 2018

_Sheila Finnegan_
SHEILA FINNEGAN
United States Magistrate Judge